# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

```
------------------------------------------------------------------  x
NATIONAL CREDIT UNION ADMINISTRATION                   :
BOARD, as Liquidating Agent of U.S. Central Federal    :
Credit Union, Western Corporate Federal Union, Members :
United Corporate Federal Credit Union, and Southwest   :
Corporate Federal Credit Union,                        :
                                                       :   CIVIL ACTION
                         Plaintiff,                    :   CASE NO. 11-cv-2341 EFM/JPO
                                                       :
                  v.                                   :
                                                       :
J.P. MORGAN SECURITIES LLC, J.P. MORGAN                :   ORAL ARGUMENT
ACCEPTANCE CORPORATION I, AMERICAN HOME                :   REQUESTED
MORTGAGE ASSETS LLC, INDYMAC MBS, INC., and            :
BOND SECURITIZATION, LLC,                              :
                                                       :
                                                       :
                         Defendants.                   :
------------------------------------------------------------------  x
```

## J.P. MORGAN DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO DISMISS THE COMPLAINT

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ...........................................................................................1

STATEMENT OF FACTS ...............................................................................................4

    A.    The Credit Unions' Certificates .........................................................4

    B.    The Offering Documents for the Credit Unions' Certificates ................................4

    C.    Public Warnings Related to Issues in the Mortgage Industry..................................6

    D.    The Credit Unions' Aggressive RMBS Investment Strategy and Failure .............11

GOVERNING LAW AND STANDARD ON THIS MOTION....................................................14

ARGUMENT .......................................................................................................................15

I.    THE BOARD FAILS TO PLEAD AN ACTIONABLE MISREPRESENTATION OR OMISSION...................................................................................................15

    A.    The Board Fails to Allege a Single Actionable Misrepresentation......................16

        1.    The Board's Misrepresentation Claims Must Be Dismissed Because the Offering Documents Disclosed that Some Mortgage Loans Would Not Comply with the General Criteria Described Therein...................................................................................16

        2.    The Board Fails To Plead an Actionable Misrepresentation Regarding the Evaluation of the Borrowers' Likelihood to Repay the Mortgage Loans......................................................17

        3.    The Board Fails To Plead an Actionable Misrepresentation Regarding Reduced Documentation Programs. .......................21

        4.    The Board Fails To Plead an Actionable Misrepresentation Regarding Loan-to-Value Ratios and Appraisal Practices......................22

        5.    The Board Fails To Plead an Actionable Misrepresentation Regarding Credit Enhancement.................................................24

    B.    The Board Fails To State an Actionable Omission Claim Because the Offering Documents Disclosed the Very Risks the Board Alleges Were Concealed.................................................................................25

    C.    The Board Fails To Plead Materiality.................................................28

II.    THE BOARD'S CLAIMS ARE TIME-BARRED...........................................30

A.      The Credit Unions Had Inquiry Notice By February 2007 at the Latest. ..............32

B.      All Claims Brought Pursuant to the Securities Act Are Time-Barred. ..................36

      1.      The Board's Securities Act Claims Are Barred By Section 13. ...............36

      2.      American Pipe Tolling Does Not Extend the Securities Act
          Statute of Limitations. ...............................................................................38

      3.      The Federal Credit Union Act Does Not Extend the Securities Act
          Statute of Limitations. ...............................................................................40

C.      The Board's State Blue Sky Law Claims Are Time-Barred. ................................42

      1.      The Kansas and California Blue Sky Law Claims Are Time-
          Barred. ......................................................................................................42

      2.      The Illinois and Texas Blue Sky Law Claims Are Time-Barred. ............42

      3.      The American Pipe Doctrine Does Not Toll the Board's State
          Law Claims. ..............................................................................................43

III.     THE BOARD'S KANSAS BLUE SKY LAW CLAIMS MUST BE DISMISSED
      FOR FAILURE TO PLEAD SCIENTER. ........................................................44

CONCLUSION ....................................................................................................................45

CERTIFICATE OF SERVICE ............................................................................................47

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

American Pipe & Construction Co. v. Utah, 414 U.S. 538 (1974)..................................38

Ames v. Uranus Inc., No. 92-2170-JWL, 1993 WL 106896 (D. Kan. Mar. 17, 1993) ................32

Anderson v. Unisys Corp., 47 F.3d 302 (8th Cir. 1995)....................................................38

Anheuser-Busch Cos. v. Summit Coffee Co., 858 S.W.2d 928 (Tex. App. 1993)........................15

Anixter v. Home-Stake Prod. Co., 939 F.2d 1420 (10th Cir. 1991) ................................36

Ashcroft v. Iqbal, 129 S. Ct. 1937 (2009)..............................................................14, 20

Battle v. A&E Television Networks, LLC, No. 11cv0013, 2011 WL 3205359 (M.D. Tenn. July 27, 2011) .................................................................................................21

Bell Atl. Corp. v. Twombly, 550 U.S. 544 (2007) .................................................14

Bell v. Showa Denko K.K., 899 S.W.2d 749 (Tex. App. 1995)..................................43

Benak ex rel. Alliance Premier Growth Fund, 435 F.3d 396 (3d Cir. 2006)...................................6

Boilermakers Nat'l Annuity Trust Fund v. WaMu Mortg. Pass-Through Certificates, Series AR1, 748 F. Supp. 2d 1246 (W.D. Wash. 2010)..............................................21, 38, 39

Bryant v. Avado Brands, Inc., 187 F.3d 1271 (11th Cir. 1999) ....................................6

Bulova Watch Co. v. United States, 365 U.S. 753 (1961)...........................................41

Burnett v. Sw. Bell Tel., 151 P.3d 837 (Kan. 2007).................................................40

Cal. Pub. Emps.' Ret. Sys. v. Chubb Corp., 394 F.3d 126 (3d Cir. 2004) ...........................20

Caprin v. Simon Transp. Servs., Inc., 99 Fed. App'x 150 (10th Cir. 2004) ....................30, 31, 32

Carver v. Workers' Comp. Appeals Bd., 217 Cal. App. 3d 1539 (Cal. Ct. App. 1990)...............41

Chevron Chem. Co. v. Voluntary Purchasing Groups, Inc., 659 F.2d 695 (5th Cir. 1981)..........41

City of Phila. v. Fleming Cos., Inc., 264 F.3d 1245 (10th Cir. 2001) .........................28

Clappier v. Flynn, 605 F.2d 519 (10th Cir. 1979) ....................................................6

Clemens v. DaimlerChrysler Corp., 534 F.3d 1017 (9th Cir. 2008)................................43, 44

_Dennler v. Trippet_, 503 U.S. 978 (1992) .................................................................36

_Deveny v. Entropin, Inc._, 42 Cal. Rptr. 3d 807 (Cal. App. 2006) ...............................31

_Dronsejko v. Thornton_, 632 F.3d 658 (10th Cir. 2011).................................................45

_Emps.' Ret. Sys. of the Gov't of the V.I. v. J.P. Morgan Chase & Co._,
    No. 09-cv-03701, 2011 WL 1796426 (S.D.N.Y. May 10, 2011) ...........................17

_Escalon v. World Group Sec., Inc._, No. 5:07-CV-214, 2008 WL 5572823 (N.D. Tex. Nov. 14,
    2008) ....................................................................................................................32

_FDIC v. Regier Carr & Monroe_, 996 F.2d 222 (10th Cir. 1993)......................41, 42, 43

_Footbridge Ltd. v. Countrywide Home Loans, Inc._, No. 09-cv-4050, 2010 WL 3790810
    (S.D.N.Y. Sept. 28, 2010) ........................................................................17, 18, 28

_Garcia v. Cordova_, 930 F.2d 826 (10th Cir. 1991)................................................28, 29

_Garcia v. Overland Bond & Inv. Co._, 668 N.E.2d 199 (Ill. App. Ct. 1996).................41

_Gee v. Pacheco_, 627 F.3d 1178 (10th Cir. 2010)..........................................................5

_GFF Corp. v. Associated Wholesale Grocers, Inc._, 130 F.3d 1381 (10th Cir. 1997)......5

_Grossman v. Novell, Inc._, 120 F.3d 1112 (10th Cir. 1997) ....................................25, 28

_Grumhaus v. Comerica Sec., Inc._, No. 99 C 1776, 2003 WL 21504185
    (N.D. Ill. June 30, 2003) ........................................................................................31

_In re Colonial Ltd. P'ship Litig._, 854 F. Supp. 64 (D. Conn. 1994) .............................39

_In re IndyMac Mortg.-Backed Sec. Litig._, 718 F. Supp. 2d 495 (S.D.N.Y. 2010)............21, 23, 40

_In re Keyspan Corp. Sec. Litig._, 383 F. Supp. 2d 358 (E.D.N.Y. 2003) .................25, 26

_In re Merrill Lynch & Co. Research Reports Sec. Litig._, 289 F. Supp. 2d 416
    (S.D.N.Y. 2003)......................................................................................................21

_In re Morgan Stanley Mortgage Pass-Through Certificates Litig._, No. 09 Civ. 2137
    (S.D.N.Y. Sept. 15, 2011) ......................................................................................37

_In re Progress Energy, Inc._, 371 F. Supp. 2d 548 (S.D.N.Y. 2005).........................22, 25

_In re Urethane Antitrust Litig._, 663 F. Supp. 2d 1067 (D. Kan. 2009).............14, 43, 44

_In re Wash. Mut. Mortg.-Backed Sec. Litig._, No. C09-37 MJP, 2011 WL 5027725
    (W.D. Wash. Oct. 21, 2011) ...................................................................................39

In re Wash. Mut. Sec., Derivative & ERISA Litig., 694 F. Supp. 2d 1192
    (W.D. Wash. 2009) .................................................................................39

Jayhawk Capital Mgmt., LLC v. LSB Indus., Inc., No. 08-2561-EFM, 2009 WL 3766371
    (D. Kan. Nov. 10, 2009) .........................................................................28

Kelly v. Primeline Advisory, Inc., 889 P.2d 130 (Kan. 1995)......................................32

Kramer v. Time Warner Inc., 937 F.2d 767 (2d Cir. 1991)...........................................6

Law v. Medco Research, Inc., 113 F.3d 781 (7th Cir. 1997) ..................................31, 32

Ley v. Visteon Corp., 543 F.3d 801 (6th Cir. 2008)...............................................20, 21

Lone Star Fund V (US), L.P. v. Barclays Bank PLC, 594 F.3d 383
    (5th Cir. 2010).........................................................................17, 18, 26

Me. State Ret. Sys. v. Countrywide Fin. Corp., 722 F. Supp. 2d 1157 (C.D. Cal. 2010) .............39

Me. State Ret. Sys. v. Countrywide Fin. Corp., No. 2:10-CV-0302, 2011 WL 4389689
    (C.D. Cal. May 5, 2011) ...........................................................................39

McMahan & Co. v. Wherehouse Ent't., Inc., 900 F.2d 576 (2d Cir. 1990) ..................................16

Morton v. Mancari, 417 U.S. 535 (1974) ...............................................................41

N.J. Carpenters Health Fund v. DLJ Mortg. Capital Inc., No. 08 Civ. 5653, 2010 WL 1473288
    (S.D.N.Y. Mar. 29, 2010) ...........................................................................23

N.J. Carpenters Health Fund v. DLJ Mortg. Capital, Inc., No. 08 Civ. 5653(PAC), 2010 WL
    6508190 (S.D.N.Y. Dec. 15, 2010).................................................................39

N.J. Carpenters Health Fund v. NovaStar Mortg., Inc., No. 08-cv-5310, 2011 WL 1338195
    (S.D.N.Y. March 31, 2011)..............................................................18, 19, 20, 21

New Mexico ex rel. Richardson v. Bureau of Land Mgmt., 565 F.3d 683 (10th Cir. 2009)...........6

Olkey v. Hyperion 1999 Term Trust, Inc., 98 F.3d 2 (2d Cir. 1996) ................................16

Ottaviano v. Home Depot, Inc., U.S.A., 701 F. Supp. 2d 1005 (N.D. Ill. 2010)..........................43

Palmer v. Stassinos, 236 F.R.D. 460 (N.D. Cal. 2006)...............................................39

Pension Trust Fund for Operating Eng'rs v. Mortg. Asset Securitization Transactions, Inc.,
    No. 10-898 (D.N.J. Sept. 29, 2011) ...............................................................37

Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp., 632 F.3d 762
    (1st Cir. 2011) ...............................................................................21, 23

Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp.,
  658 F. Supp. 2d 299 (D. Mass. 2009) ...............................................................23, 24

Portwood v. Ford Motor Co., 183 Ill. 2d 459 (1998) ....................................................43

Pub. Emps.' Ret. Sys. of Miss. v. Merrill Lynch & Co., 714 F. Supp. 2d 475
  (S.D.N.Y. 2010).........................................................................................................38

Robbins v. Oklahoma, 519 F.3d 1242 (10th Cir. 2008) ................................................14

Rochford v. Joyce, 755 F. Supp. 1423 (N.D. Ill. 1990)..................................................44

Rubke v. Capitol Bancorp Ltd., 551 F.3d 1156 (9th Cir. 2009) ....................................30

Sable v. Southmark/Envicon Capital Corp., 819 F. Supp. 324 (S.D.N.Y. 1993) ..........26

Sawyer v. Atlas Heating and Sheet Metal Works, Inc., 642 F.3d 560 (7th Cir. 2011)..................44

Schwartz v. Celestial Seasonings, Inc., 124 F.3d 1246 (10th Cir. 1997) ......................20

Shields v. Citytrust Bancorp, 25 F.3d 1124 (2d Cir. 1994) ..........................................23

Simmons Invs., Inc. v. Conversational Computing Corp., No. 09-CV-2345, 2011 WL 673759
  (D. Kan. Feb. 17, 2011) .......................................................................................15, 44

Spears v. Metro. Life Ins. Co., No. 2:07-CV-88, 2009 WL 2408928
  (N.D. Ind. Aug. 4, 2009).............................................................................................25

State Farm Mut. Auto Ins. Co. v. Boellstorff, 540 F.3d 1223 (10th Cir. 2008) .............43

Sterlin v. Biomune Sys., 154 F.3d 1191 (10th Cir. 1998) ...........................................31

Stone v. Enstam, 541 S.W.2d 473 (Tex. App. 1976)....................................................32

Tirapelli v. Advanced Equities, Inc. 813 N.E.2d 1138 (Ill. App. Ct. 2004) ..................15

TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438 (1976) ............................................29

Tsereteli v. Residential Asset Securitization Trust 2006-A8, 692 F. Supp. 2d 387
  (S.D.N.Y. 2010).....................................................................................................23, 24

Vaught v. Showa Denko K.K., 107 F.3d 1137 (5th Cir. 1997) .....................................43

Viterbi v. Wasserman, 191 Cal. App. 4th 927 (Cal. Ct. App. 2011) .............................15

**Statutes & Rules**

815 Ill. Comp. Stat. Ann. 5/12(G), 5/13(D).........................................................15, 31, 41

12 U.S.C. § 1787(b)(14)(A) ................................................................................40

Cal. Corp. Code § 25401 ..............................................................................15, 31

Cal. Corp. Code § 25506(b) ...........................................................................31, 41

Fed. R. Civ. P. 9(b) ..............................................................................................19

Fed. R. Civ. P. 12(b)(6) .....................................................................................5, 14

Kan. Stat. Ann. § 17-12a509 ...............................................................15, 32, 41, 44

Securities Act of 1933 §§ 11, 12, 13, 14, 15 U.S.C. §§ 77k, 77l, 77m, 77q ........................ passim

Securities Exchange Act of 1934 § 10, 15 U.S.C. 78j .......................................15, 44

Tex. Rev. Civ. Stat. Ann. art. 581, § 33 ..........................................................15, 32, 41

Defendants J.P. Morgan Securities LLC, J.P. Morgan Acceptance Corporation I and Bond Securitization, LLC (collectively, the "J.P. Morgan Defendants") respectfully submit this memorandum of law in support of their motion to dismiss the complaint filed by plaintiff National Credit Union Administration Board (the "Board") in the above-captioned matter.[1]

## PRELIMINARY STATEMENT

Despite warnings from the offering documents, the news media and even the Board itself, the Credit Unions made the informed decision to plunge the majority of their assets into residential mortgage-backed securities ("RMBS") at the height of the housing bubble. That investment strategy—which even the Board has condemned as "aggressive", "excessive" and "unreasonable"—backfired when the housing bubble burst. The Credit Unions lost their "unreasonable" wager and subsequently collapsed.

Ignoring its own assessment of what actually happened, the Board now seeks to blame defendants for the Credit Unions' losses. It asserts claims under sections 11 and 12(a)(2) of the Securities Act of 1933 and four state Blue Sky statutes, all based on four categories of alleged misstatements in defendants' offering documents: (i) statements regarding the standards by which the Originators of the mortgages made the loans (i.e., the Originators' underwriting guidelines); (ii) statements regarding underwriting for "reduced documentation" loans; (iii) statements regarding appraised "loan-to-value" ratios; and (iv) statements regarding "credit enhancement" measures.

In setting forth its allegations of misrepresentations, the Board points almost

---

[1] The Board brings this action in its capacity as the liquidating agent for four federally chartered credit unions: U.S. Central Federal Credit Union ("U.S. Central"); Western Corporate Federal Credit Union ("WesCorp"); Members United Corporate Federal Credit Union ("Members United"); and Southwest Corporate Federal Credit Union ("Southwest") (collectively, the "Credit Unions").

entirely to generalized information that was available to the Credit Unions years before they entered into conservatorship (and more than three years before the Board entered into a tolling agreement with the J.P. Morgan Defendants).  The Board also alleges in conclusory fashion that (i) because of the number of loans underlying the RMBS that went delinquent—during the worst economic crisis in nearly a century—the Originators **must have** systematically disregarded their underwriting guidelines when they made the loans and (ii) because lenders purportedly had an incentive to originate and distribute as many loans as possible, the Originators **must have** completely abandoned their underwriting guidelines in an attempt to do so.  Such conclusions are not well-founded and are certainly insufficient to state a claim.  Instead, the Board is required to set forth specific, well-pleaded factual allegations that plausibly demonstrate that defendants made material misrepresentations in the offering documents at issue.  It has not done so.

First, the Board fails to plead a single actionable misrepresentation:

- Fundamentally, each of the Board's claims turns on the allegation that some loans in the trusts underlying the Certificates did not conform to the Originators' stated underwriting guidelines.  But the offering documents expressly warned that the offerings might contain such loans—and even described a process by which nonconforming loans (which all parties knew would exist) could be repurchased or substituted for conforming loans.  (Infra § I.A.1.)

- The Board's allegations that the Originators abandoned their underwriting guidelines fail because (i) there are no allegations tying any alleged underwriting defect to any offering at issue; (ii) the offering documents disclosed that some loans would not conform to the general descriptions of loan quality set forth therein; and (iii) the purported "evidence" of abandoned underwriting cited by the Board can plausibly be explained only by the general economic disaster, not anything to do with underwriting, as the Board itself admitted before deciding to sue.  (Infra § I.A.2.)

- The Board's claims regarding the underwriting of "reduced documentation" loans fail for the same reasons as its general underwriting allegations—and for the additional reasons that the offering documents (i) explicitly disclosed that reduced documentation programs required little or no verification of a borrower's income, assets or employment; (ii) warned of the risks associated with reduced documentation loans; and (iii) warned that many (and typically, most) of the loans in the pools were risky reduced documentation loans.  (Infra § I.A.3.)

- The Board's claims based on allegedly inflated appraisal values (resulting in allegedly deflated loan-to-value ratios) fail because (i) appraisals are non-actionable statements of opinion and (ii) the offering documents expressly warned that appraisals and loan-to-value ratios might fluctuate and were not reliable indicators of potential losses.  (<u>Infra</u> § I.A.4.)

- The Board's claims based on allegedly "illusory" credit enhancement measures fail because the offering documents expressly warned that credit enhancement measures might not be adequate to cover losses.  (<u>Infra</u> § I.A.5.)

<u>Second</u>, the Board fails to plead a single actionable omission because the offering documents disclosed the very risks that the Board alleges were concealed.  For example, the Board claims that the offering documents were misleading because some underlying loans did not comply with the applicable underwriting guidelines.  But the offering documents disclosed that there would be noncompliant loans in the pools **<u>and</u>** provided an express mechanism by which such loans could be repurchased or replaced.  The Board also alleges that certain credit enhancement features proved to be ineffective.  But the offering documents disclosed that certain credit enhancement features might prove to be ineffective.  Indeed, **<u>every</u>** allegedly omitted risk was the subject of extensive disclosures in the offering documents.  As a result, each of the Board's omission claims should be dismissed.  (<u>Infra</u> § I.B.)

<u>Third</u>, in light of the robust risk disclosures and other information available to the Credit Unions, the Board cannot plausibly allege that any of the purported misrepresentations was material.  Indeed, the Board itself warned the Credit Unions in 2005—<u>before</u> any of the transactions at issue—of the risks associated with nontraditional mortgages.  (<u>Infra</u> § I.C.)

<u>Fourth</u>, the Board's claims are barred by the applicable statutes of limitations.  By no later than February 2007, warnings from the media, the offering documents and the Board itself would have placed any reasonable investor on notice of the risks the Board now alleges were concealed.  As a result, each relevant statute of limitations expired well before the Board filed suit.  (<u>Infra</u> § II.)

3

## STATEMENT OF FACTS[2]

### A.    The Credit Unions' Certificates

The Credit Unions purchased RMBS certificates (the "Certificates") that were created in a multi-step securitization process.  (Compl. ¶¶ 27–41.)  The process begins when banks originate mortgage loans to borrowers buying homes or refinancing existing mortgages.[3]  The originators determine which borrowers to lend to (and which types of loans to offer) based on flexible underwriting guidelines, which permit exceptions to the general requirements.

A sponsor buys loans from originators, aggregates them into a loan pool and sells the pool to a depositor.  The depositor transfers the loans to a trust established to hold the loans and distribute loan payments.  In exchange, the trust issues certificates to the depositor, which sells the certificates to an underwriter for resale to investors.

Certificates entitle RMBS purchasers to a pro rata share of the monthly cash flow from the borrowers' payments on the underlying loans and are sold in different classes or "tranches" of priority.  (Compl. ¶¶ 42–52.)  Different classes of certificates are distinct securities with different risk and return profiles.  Senior certificate classes receive the most protection against losses on the underlying loans, for example, and are the first to receive mortgage pass-through distributions and the last to bear underlying loan losses.

### B.    The Offering Documents for the Credit Unions' Certificates

The offering documents for the Certificates provided detailed descriptions of the offerings, including descriptions of the underlying loan pools and the Originators' loan

---

[2] Allegations in the Complaint, if well pleaded, are assumed to be true only for the purpose of this motion to dismiss, and only to the extent they are not inconsistent with judicially noticeable facts.

[3] The Complaint challenges the underwriting practices of eleven originators:  American Home, Ameriquest, Chase Home Finance, Chase Home Mortgage, J.P. Morgan Chase Bank, N.A., Countrywide, Greenpoint, IndyMac, New Century, NovaStar and Option One (collectively, the "Originators").  (Compl. ¶¶ 108–235.)

underwriting guidelines.[4]  The offering documents disclosed that much of this information was supplied by the Originators and by third-party appraisers.[5]  While the offering documents described the Originators' underwriting guidlines **in general**, they did not make any absolute representations regarding whether individual loans complied with those guidelines.[6]  They also made clear that some loans would not comply even with the Originators' general guidelines and set forth mechanisms by which noncompliant loans could be repurchased or replaced.[7]

The offering documents disclosed the risks associated with the offerings and the underlying loans.  They warned that the Originators made exceptions to underwriting guidelines to approve loans to borrowers who do "not strictly qualify[] under the underwriting risk category

---

[4] See Ex. 17 at 1–2.  The offering documents include a Prospectus and a Prospectus Supplement, which incorporate by reference or attachment, among other documents, a Pooling and Servicing Agreement between the Depositor, Trust Administrator and Servicer, and each of which was filed with the Securities and Exchange Commission.  The J.P. Morgan Defendants request that the Court take judicial notice of the offering documents cited herein and in Exhibits 1–16 to the Declaration of Benjamin Brutlag ("Brutlag Decl.").  See Gee v. Pacheco, 627 F.3d 1178, 1186 (10th Cir. 2010) (district court may consider on Rule 12(b)(6) motion the full text of "documents referred to in the complaint if the documents are central to the plaintiff's claim and the parties do not dispute the documents' authenticity, . . . and [] matters of which a court may take judicial notice"); GFF Corp. v. Associated Wholesale Grocers, Inc., 130 F.3d 1381, 1384–85 (10th Cir. 1997) (noting defendants may submit copies of such documents on a motion to dismiss).  Each offering document, cited herein by offering name and exhibit number (e.g., JPALT 2007-A2 (Ex. 9)), includes the Prospectus Supplement followed by the Prospectus for that offering; Prospectus Supplement pages are designated by the prefix "S-".  For each type of disclosure discussed in this motion, Exhibits 17–18 compile the page numbers and text, respectively, where that disclosure can be found in each Prospectus Supplement and/or Prospectus.

[5] See, e.g., JPALT 2007-A2 (Ex. 9) at S-38, S-44 ("Each appraisal contains an opinion of value that represents the appraiser's professional conclusion" which is "used to calculate the [LTV ratio]."); see also Ex. 17 at 3; Ex. 18 at A.1.

[6] See, e.g., JPALT 2007-A1 (Ex. 8) at S-35 to S-36 (loans were "underwritten substantially in accordance with the underwriting criteria specified"—e.g., "In general, a prospective borrower applying for a loan is required to . . ."; "borrower generally is required to . . ."; "In most cases . . . ."; "borrower may be required to . . .") (emphasis added); see also Ex. 17 at 4; Ex. 18 at A.2.

[7] See, e.g., JPALT 2006-A2 (Ex. 4) at S-27 (The Originators will make "certain representations, warranties and covenants" "relating to, among other things, certain characteristics of the Mortgage Loans. . . .  An Originator or the Seller will be obligated to purchase or substitute a similar mortgage loan for any Defective Mortgage Loan as described in 'The Agreements—Assignment of the [Trust Fund] Assets' in the accompanying prospectus and 'The [Trust Fund]—Representations by Sellers or Originators; Repurchases' in the accompanying prospectus."); see also Ex. 17 at 5; Ex. 18 at A.3.

guidelines". (JPMAC 2006-HE1 (Ex. 11) at S-60.) They warned that, in some cases, "a substantial portion of the Mortgage Loans represent such underwriting exceptions". (Id. (emphasis added); see also Ex. 17 at 6; Ex. 18 at A.4.) They also warned that (i) appraised residential property values fluctuate;[8] (ii) under reduced documentation programs, borrower income, employment and/or asset information may not be collected or verified;[9] and (iii) credit enhancement measures might not protect investors from losses.[10]

### C.   Public Warnings Related to Issues in the Mortgage Industry

The Credit Unions were familiar with the risks associated with the mortgage loans backing their RMBS and the lending practices used to originate those loans.[11] In fact, the Credit Unions were major players in the mortgage industry; they oversaw and provided financial

---

[8] See, e.g., JPALT 2006-A2 (Ex. 4) at S-19, S-22, S-46 ("We cannot assure you that the values of the mortgaged properties have remained or will remain at levels in effect on the date of origination of the related mortgage loans. . . .  No assurance can be given that the value of any mortgaged property has remained or will remain at the level that existed on the appraisal or sales date.  If residential real estate values generally or in a particular geographic area decline, the Loan-to-Value Ratios might not be a reliable indicator of the rates of delinquencies, foreclosures and losses that could occur with respect to the mortgage loans."); see also Ex. 17 at 7; Ex. 18 at A.5.

[9] See, e.g., JPALT 2006-A2 (Ex. 4) at S-30, S-35, S-37 to S-38, S-40, S-43 to S-44 ("A lender may also originate loans pursuant to alternative sets of underwriting criteria under reduced or limited documentation programs", under which "certain documentation concerning income/employment and asset verification is reduced or excluded."); see also Ex. 17 at 10; Ex. 18 at A.8.

[10] See, e.g., JPALT 2006-A2 (Ex. 4) at S-16 to S-18 ( "[S]ubordination and loss allocation features . . . are limited in nature and may be insufficient to cover all losses on the related mortgage loans. . . .  If subordination is insufficient to absorb losses, then holders . . . will incur realized losses and may never receive all of their principal payments. . . .  [W]e cannot assure you that the credit enhancement will adequately cover any shortfalls in cash available to pay your certificates as a result of delinquencies or defaults . . . ."); see also Ex. 17 at 13; Ex. 18 at A.11.

[11] The J.P. Morgan Defendants request that the Court take judicial notice of the cited materials to show that (1) the total mix of information in the market rendered any misstatements or omissions immaterial and (2) the information placed the Credit Unions on inquiry notice of their claims.  See, e.g., New Mexico ex rel. Richardson v. Bureau of Land Mgmt., 565 F.3d 683, 703 n.22 (10th Cir. 2009) (taking judicial notice of information referenced on federal agency websites and in state agency meeting minutes); Benak ex rel. Alliance Premier Growth Fund, 435 F.3d 396, 401 & n.15, 403–04 (3d Cir. 2006) (taking judicial notice of newspaper articles where introduced "to indicate what was in the public realm", and affirming dismissal of §§ 11 and 12 claims as untimely where public information in news reports and other sources put plaintiff on inquiry notice on inquiry notice); Bryant v. Avado Brands, Inc., 187 F.3d 1271, 1276–80 (11th Cir. 1999) (taking judicial notice of SEC filings); Kramer v. Time Warner Inc., 937 F.2d 767, 773–74 (2d Cir. 1991); Clappier v. Flynn, 605 F.2d 519, 535 (10th Cir. 1979) (taking judicial notice of a federal government publication).

services to a network of credit unions that originated the same types of mortgage products, using the same type of reduced documentation programs that are the subject of the Board's allegations. (See, e.g., Letter from Nat'l Credit Union Admin. to Federally Insured Credit Unions, Increasing Risks in Mortgage Lending (Oct. 2005) (Ex. 19) at 9–10 (directing examiners to monitor liberalized underwriting and reduced documentation practices at credit unions).)  The Credit Unions themselves purchased tens of millions of dollars worth of actual mortgage loans originated by member credit unions.[12]

In connection with those activities, the Credit Unions received several direct warnings from the Board concerning the risks associated with the type of loans backing their RMBS investments.  For example, on May 16, 2005, the Board and other federal regulators issued credit risk management guidelines for home equity loans that warned of "risk factors that . . . have attracted scrutiny, including . . . **[l]imited or no documentation of a borrower's assets, employment and income**" and "**eased underwriting standards**".  (Joint Press Release, Bd. of Governors of Fed. Reserve Sys. et al., Agencies Issue Credit Risk Management Guidance for Home Equity Lending (May 16, 2005) (Ex. 23) at 1–2 (emphasis added).)  The guidelines stressed the need to "closely monitor the quality of loans [from third-party lenders] . . . includ[ing] post-purchase underwriting reviews".  (Id. at 4.)  The guidelines further stated that "[m]onitoring the quality of loans by origination source, and **uncovering such problems as early payment defaults and incomplete packages, enables management to know if third-party originators are producing quality loans**".  (Id. at 4.)  The guidelines also alerted the

---

[12] See, e.g., Members United Corp. Fed. Credit Union, 2007 Owners' Report (2008) (Ex. 20) at 36 (Members United participated in over $37 million in residential mortgage loans); W. Corp. Fed. Credit Union and Subsidiary, Consolidated Financial Statements December 31, 2007 and 2006 (2008) (Ex. 21) at 28 (WesCorp had over $29 million in mortgage participation); U.S. Cent., The Art of Growth: 2006 Annual Report (2007) (Ex. 22) at 13 (Charlie Mac, a wholly owned subsidiary of U.S. Central, "broaden[ed]" its investment strategy by buying Alt-A mortgage loans).

Credit Unions to the potential for "value shopping", i.e., the "**systematic overvaluation of properties**" resulting from industry use of "several valuation tools [that] may return different values for the same property".  (Id. at 5 (emphasis added).)

The Board discussed similar risks in an October 2005 report issued to the Credit Unions.  In a section titled "Liberalized Underwriting Standards", the Board warned that "**[t]o remain competitive and increase volume, many lenders appear to be loosening their credit standards**" and that this "trend towards liberalizing underwriting standards further increases credit risk".  (Letter from Nat'l Credit Union Admin. to Federally Insured Credit Unions, Increasing Risks in Mortgage Lending (Oct. 2005) (Ex. 19) at 8 (emphasis added).)  In the same report, the Board instructed credit union examiners to "be alert to **changes in underwriting procedures** . . . indicating an increased appetite for credit risk".  (Id. at 3 (emphasis added).)

A year later, in interagency guidelines published in October 2006, the Board repeated these same warnings and advised credit unions to "monitor compliance with underwriting standards and exceptions to those standards" that were being used to originate high-risk "nontraditional loan products" like those that allegedly underlie the Credit Unions' RMBS.  (Letter from Nat'l Credit Union Admin. to Federally Insured Credit Unions, Interagency Guidance on Nontraditional Mortgage Product Risk (Oct. 2006) (Ex. 24) (quoting 71 Fed. Reg. 58,609, at 58,615 (Oct. 4, 2006)).)

Around the same time that the Board was issuing these warnings—in 2006 and early 2007—media and analyst reports, as well as regulatory inquiries, publicly reported similar issues.  For example, the New York Times reported that "[r]egulators . . . are worried that lenders have lowered underwriting standards", including by the use of alternative and stated

documentation loans.[13]  Reports of allegedly improper origination practices were also

prevalent.[14]  For example, on April 21, 2006, the Los Angeles Times quoted the chairman of an

originator as saying that "[w]e hear lots and lots of stories of institutions inappropriately

underwriting the loans and then selling them off . . . ."[15]  Another report noted that "[s]lowing

home price appreciation and weakened underwriting standards are creating dramatically poor

performance across a wide swath of 2006 mortgages".[16]  Other reports reflected rising rates of

mortgage delinquency and foreclosure.[17]  And on March 12, 2007, IndyMac shareholders filed a

---

[13] Julie Creswell, Chief Calls Deal a Dream For Wachovia, N.Y. Times, May 9, 2006, at C1 (Ex. 25); see also Alison Vekshin, Rise in Nontraditional Mortgages is Worrying U.S. Lawmakers, Phila. Inquirer, Sept. 21, 2006, at C4 (Ex. 26) (reporting that U.S. senators had expressed concern over mortgage lenders' "lax underwriting standards"); Office of the Comptroller of the Currency Survey Finds Increased Easing of Commercial, Retail Credit Underwriting Standards, US Fed News, Oct. 18, 2006 (Ex. 27) (U.S. Office of the Comptroller of the Currency "reported that competitive pressures have led to a third consecutive year of eased commercial and retail credit underwriting standards"); Subprime Subsidence; Mortgage Lending, Economist, Dec. 16, 2006 (Ex. 28) (warning of potential consequences arising from a "weakening of underwriting standards").  By 2007, the loosening of underwriting guidelines was taken as a matter of fact.  See, e.g., Preserving the American Dream: Predatory Lending Practices and Home Foreclosures, Hearing Before the S. Comm. on Banking, Housing, and Urban Affairs, 110th Cong. 2 (2007) (Ex. 29) (statement of Martin Eakes, CEO, Ctr. for Lending and Ctr. for Cmty. Self-Help) ("It is widely recognized today, even within the mortgage industry, that lenders have become too lax in qualifying applicants for subprime loans.  Especially troubling is the practice of qualifying borrowers without any verification of income . . . .") (footnote omitted); Debash Chatterjee et al., Moody's Investors Service, 2006 Review and 2007 Outlook: Home Equity ABS 1 (Jan. 22, 2007) (Ex. 30) ("The change in landscape in 2006 for the sub-prime mortgage business was a result of the excesses of the past whereby favorable market conditions led lenders to loosen their origination guidelines and underwriting practices in an effort to capture market share.").

[14] See Fin. Crimes Enforcement Network Office of Regulatory Analysis, Dep't of the Treasury, Mortgage Loan Fraud: An Industry Assessment Based Upon Suspicious Activity Report Analysis (Nov. 2006) (Ex. 31) (available at http://www.fincen.gov/news_room/rp/reports/pdf/MortgageLoanFraud.pdf) (discussing loan origination practices); Bob Tedeschi, When the Truth Goes Begging, N.Y. Times, Aug. 27, 2006 (Ex. 32) (A study of 100 stated-income mortgages revealed that "90 percent of those who apply for stated-income loans exaggerate their income by 5 percent or more.  Nearly 60 percent exaggerate their income by more than 50 percent.")

[15] E. Scott Reckard, Regulator Warns About Nontraditional Mortgages, L.A. Times, Apr. 21, 2006 (Ex. 33); see also Ruth Simon & James R. Hagerty, More Borrowers With Risky Loans Are Falling Behind—Subprime Mortgages Surged As Housing Market Soared; Now, Delinquencies Mount, Wall St. J., Dec. 5, 2006, at A1 (Ex. 34) (reporting increasing borrower fraud, in which borrowers are "coached by loan officers or mortgage brokers to inflate their incomes").

[16] Allison Pyburn, 2006 HE ABS vintage: the worse [sic] ever?, Asset Securitization Rep., Nov. 27, 2006 (Ex. 35).

[17] See, e.g., Joseph A. Rocco, Moody's Investors Service, Early Defaults Rise in Mortgage Securitizations 1 (Jan. 18, 2007) (Ex. 36) ("Mortgages backing securities issued in late 2005 and early 2006 have had sharply higher

class action complaint alleging that IndyMac had failed to disclose "the failure of [its]

underwriting guidelines to adequately manage the risk of loan delinquencies". (Breach of

Fiduciary Duty and Class Action Complaint for Violations of Federal Securities Laws at 33,

Reese v. IndyMac Fin., Inc., No. CV 07-01635 (C.D. Cal. Mar. 19, 2007) (Ex. 51).)

        In addition to these general reports, the Credit Unions had access to loan data and

other information (made available by the Securities Administrator or Trustee to all

certificateholders) for each of their Certificates, and for certificates backed by similar loan

pools.[18]  Those monthly reports disclosed, among other things, the percentage of delinquent

loans in the loan pools underlying each tranche.[19]  At the same time that the Board was directing

the Credit Unions to "uncover[] such problems as early payment defaults" to determine "if third-

party originators are producing quality loans", the monthly reports reflected an increase in

delinquencies and defaults in the relevant mortgage pools. (See Compl. at Table 5.) And the

---

rates of foreclosure, real estate owned (REO) and loss than previously issued securities at similar, early points in their lives."); Aparajita Saha-Bubna, Risky Slice of ABX Index Widens Sharply on Novastar, Dow Jones Newswires, Feb. 21, 2007 (Ex. 37) ("A benchmark index of derivatives of subprime mortgages widened sharply to record weak levels Wednesday, fueled by a continuing spate of bad news around loans to home buyers with shaky or inadequate credit histories."); Herb Greenberg, MarketWatch Weekend Investor: Don't Forget, Higher Reward Comes With a Higher Risk, Wall St. J., Feb. 24, 2007, at B3 (Ex. 38) ("[A] compilation of data showed that as of the end of January, there had been a perilous rise in delinquencies in the pools of mortgages NovaStar had packaged and sold.")

   [18] The Offering Materials for each offering state that the Securities Administrator or Trustee would prepare monthly loan performance reports for the Certificateholders. The Offering Materials also provide the website where Certificateholders could access these reports.  See, e.g., JPALT 2006-A2 (Ex. 4) at S-61, S-64 ("**Reports to Certificateholders** . . . .  On each distribution date, the Securities Administrator will make available a report setting forth certain information . . . relating to the Certificates and mortgage loans, to be made available to each holder of Certificates . . . via the Securities Administrator's internet website, which can be obtained by calling the Securities Administrator's customer service desk at (301) 815-6600 and shall initially be www.ctslink.com. . . .  Wells Fargo Bank is also responsible for securities administration, which includes . . . preparation of monthly distribution reports.") (emphasis in original); see also Ex. 50 (Offering Document Disclosures Concerning Securities Administrator / Trustee Monthly Reports to Certificateholders).

   [19] See, e.g., JPALT 2006-A2 (Ex. 4) at S-61, 38–39 ("For a description of the information available in this statement please see 'Reports to Securityholders' in the accompanying prospectus."  "**Reports to Securityholders**" in the prospectus explains that each securityholder receives a monthly statement "setting forth . . . among other things . . . the number of and aggregate principal balances of loans that are either delinquent, but not in foreclosure or are in foreclosure".) (emphasis in original); see also Ex. 50.

Board has alleged that "spike[s] in delinquencies and defaults . . . occurred almost immediately after these RMBS were purchased by the Credit Unions".  (See Compl. ¶ 66.)  The Credit Unions had access to that data on a rolling basis.  They also had access to ABSNET data, which (according to the Board) showed that, by June 2006, "actual losses" in the loan pools for some of the Certificates exceeded "expected losses" by as much as 30%.[20]

Offering documents at this time also began to warn of the increased risks associated with investing in RMBS in the face of the continued softening in the housing market. For example, the February 15, 2007 JPALT 2007-A1 prospectus supplement stated:

- "Recently, the residential mortgage market in the United States has experienced a variety of difficulties and changed economic conditions that may adversely affect the yield on your certificates.  Delinquencies and losses with respect to residential mortgage loans generally have increased in recent months, and may continue to increase, particularly in the subprime sector.  In addition, in recent months housing prices and appraisal values in many states have declined or stopped appreciating, after extended periods of significant appreciation.  A continued decline or an extended flattening of those values may result in additional increases in delinquencies and losses on residential mortgage loans . . . ."  (JPALT 2007-A1 (Ex. 8) at S-16.)

- "[N]umerous residential mortgage loan originators that originate subprime mortgage loans have recently experienced serious financial difficulties and, in some cases, bankruptcy.  **Those difficulties have resulted in part from declining markets for mortgage loans as well as from claims for repurchases of mortgage loans previously sold under provisions that require repurchase in the event of early payment defaults, or for material breaches of representations and warranties made on the mortgage loans, such as fraud claims.**"  (Id. at S-17 (emphasis added).)

D.     **The Credit Unions' Aggressive RMBS Investment Strategy and Failure**

Despite the data, reports and statements pointing to the increasing risk of investing in RMBS, and despite direct warnings from the Board itself, each of the Credit Unions

---

[20] See Compl. ¶¶ 74–84 & Figure 2.  For example, according to Figure 2 in the Complaint, by August 2006, "actual losses" exceeded "expected losses" by 30% or more in each of the loan pools backing JPMAC 2006-HE1 (June 2006) and JPALT 2006-A2 (August 2006).

invested a large portion of its portfolio in RMBS at the height of the housing bubble.  The Credit

Unions failed when the bubble burst.[21]  The Board placed U.S. Central and WesCorp into

conservatorship on March 20, 2009, and placed Members United and Southwest into

conservatorship on September 24, 2010.  (Compl. ¶ 16.)

    When credit unions suffer a material loss, the NCUA's Office of the Inspector

General ("NCUA-OIG") conducts a "Material Loss Review" to determine the causes of the loss.

The NCUA-OIG has published Material Loss Reviews for each of the Credit Unions.[22]  These

reports found that the Credit Unions "**should have** recognized the risk exposure that [their]

significant concentration in mortgage-backed securities represented **earlier than 2007 and

2008**" and "**should have** been more vigilant about investing so heavily in higher risk residential

mortgage loans taken out by borrowers with the questionable ability to repay the mortgages".

(Members United MLR (Ex. 39) at 2–3; WesCorp MLR (Ex. 40) at 25; U.S. Central MLR (Ex.

42) at 4 (emphasis added).)

    The reports also found that each of the Credit Unions failed because their

management pursued an unreasonable and "aggressive" investment strategy:

-   The NCUA-OIG concluded that U.S. Central implemented an "aggressive growth
  strategy" and that "[s]ubprime mortgage-backed securities were purchased for

---

[21] Before failing, WesCorp held nearly 70% of its portfolio in RMBS, Members United and Southwest
Corporate nearly 60%, and U.S. Central approximately 50%.  See U.S. Cent., The Art of Growth: 2006 Annual
Report (2007) (Ex. 22) at 20  ("Mortgage-backed securities continued to represent the largest portion of investment
securities [held by U.S. Central] throughout 2006 at 47.4 percent of the portfolio, compared to 45.1 percent in
2005."); Nat'l Credit Union Admin, Office of Inspector Gen., Material Loss Review of Members United Corp. Fed.
Credit Union (May 4, 2011) (Ex. 39) at 16 (hereinafter "Members United MLR"); Nat'l Credit Union Admin.,
Office of Inspector Gen., Material Loss Review of W. Corp. Fed. Credit Union (Nov. 16, 2010) (Ex. 40) at 16
(hereinafter "WesCorp MLR"); Sw. Corp. Fed. Credit Union, Inner Strength: 2007 Annual Report (2008) (Ex. 41) at
7–12 .

[22] Nat'l Credit Union Admin., Office of Inspector Gen., Material Loss Review of U.S. Cent. Fed. Credit Union
(Oct. 18, 2010) (Ex. 42) at 4 (hereinafter "U.S. Central MLR"); Members United MLR, (Ex. 39) at 3–4; Nat'l Credit
Union Admin., Office of Inspector Gen., Material Loss Review of Sw. Corp. Fed. Credit Union (Sept. 22, 2011)
(Ex. 43) at 36 (hereinafter "Southwest MLR"); WesCorp MLR, (Ex. 40) at 25.

U.S. Central's investment portfolio in order to achieve this objective." (<u>U.S. Central MLR</u> (Ex. 42) at 1.)

- WesCorp pursued a similar "aggressive investment strategy with unreasonable limits in place that allowed for excessive investments in privately-issued residential mortgage backed securities". (<u>WesCorp MLR</u> (Ex. 40) at 1.)

- Southwest also "implemented an aggressive investment strategy with high limits in place that allowed for a significant concentration of investments directly in privately-issued residential mortgage backed securities." Southwest's exposure to RMBS increased 263% between March 2004 and July 2007. As a result of this buildup in RMBS inventory, as of July 2007, "Southwest's direct exposure to the residential real estate market through privately-issued RMBS peaked at 839 percent of Southwest's capital". (<u>Southwest MLR</u> (Ex. 43) at 1, 16, 18.)

- Members United suffered from "inadequate management and Board oversight that exposed the credit union to excessive amounts of financial risk due to significant holdings of private label mortgage-backed securities including subprime and Alt-A mortgage-related securities". Members United's "aggressive structuring of the portfolio in mortgage related securities contributed to [its] operating difficulties". (<u>Members United MLR</u> (Ex. 39) at 11, 25.)

Indeed, the Board has even sued WesCorp's officers and directors for breaching their fiduciary duties by pursuing an unreasonable RMBS investment strategy and by ignoring known risks, alleging that:

- "[B]y the end of 2007, the concentration of private label MBS in WesCorp's portfolio increased to more than $22 billion, or about 95% of WesCorp's total investment portfolio". (Second Amended Complaint at ¶ 38, <u>NCUAB v. Siravo</u>, No. CV10-01597 GW, ECF No. 116 (C.D. Cal. Feb. 22, 2011) (Ex. 44).)

- "[Such loans were] inherently risky because (1) they were made without the normal investigation of whether the borrower could afford the loan and (2) <u>they were essentially bets that residential real estate markets would continue to rise</u>, allowing the borrowers to refinance before their loans reset and they were required to make substantially higher monthly payments". (<u>Id.</u> ¶ 79 (emphasis added).)

- "[T]he overwhelming concentration of private label MBS in WesCorp's investment portfolio was not prudent. . . . <u>If WesCorp's officers and directors had imposed prudent concentration limits on its private label MBS, including its Option ARM MBS, almost all of this loss would have been avoided.</u>" (<u>Id.</u> ¶¶ 39, 41 (emphasis added).)

- In its opposition to a motion to dismiss filed by WesCorp officers, the Board

13

argued: "**By the summer of 2005** [WesCorp management should have been aware that] **the credit quality of the Option ARM MBS loan pools was deteriorating; and [that] a drop in housing demand could result in a decrease in real estate values and credit losses**".  (Plaintiff Nat'l Credit Union Admin. Bd. Mem. in Opp'n to Mot. to Dismiss at 13, <u>NCUAB v. Siravo</u>, No. CV10-01597 GW, ECF No. 128 (C.D. Cal. May 12, 2011) (Ex. 45).)

## <u>GOVERNING LAW AND STANDARD ON THIS MOTION</u>

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a complaint must allege "enough facts to state a claim to relief that is plausible on its face." <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 570 (2007); <u>Robbins v. Oklahoma</u>, 519 F.3d 1242, 1247–48 (10th Cir. 2008).  "'Plausibility' in this context refers to the scope of the allegations in a complaint:  if they are so general that they encompass a wide swath of conduct, much of it innocent, then the [plaintiff 'has] not nudged [its] claims across the line from conceivable to plausible.'" <u>Robbins</u>, 519 F.3d at 1247 (quoting <u>Twombly</u>, 550 U.S. at 570).  The Court should dismiss the Complaint if "the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct".  <u>In re Urethane Antitrust Litig.</u>, 663 F. Supp. 2d 1067, 1073 (D. Kan. 2009) (quoting <u>Ashcroft v. Iqbal</u>, 129 S. Ct. 1937, 1949 (2009)).  "[L]abels and conclusions" and "naked assertions devoid of further factual enhancement" will not suffice. <u>Iqbal</u>, 129 S. Ct. at 1949 (internal quotations omitted).

Each of the Board's state Blue Sky law claims implicates a statute that has been modeled after federal securities law provisions.  In each instance, courts look to federal law for guidance in interpreting the relevant state statutes:

| State Liability Provision | Equivalent Federal Provision | Applicability of Federal Law |
|---|---|---|
| Cal. Corp. Code § 25401 | Section 12(a)(2), '33 Act | "Sections 25401[ and] 25501 . . . are modeled after section [12(a)(2)] of the Securities Act of 1933. . . . [F]ederal cases construing federal securities laws are persuasive authority when interpreting our state law." Viterbi v. Wasserman, 191 Cal. App. 4th 927, 937 (Cal. Ct. App. 2011) (internal quotations and citations omitted). |
| 815 Ill. Comp. Stat. Ann. 5/12(G) | Section 17(a)(2), '33 Act | "Because sections 12(F), 12(G), and 12(I) of the Illinois Securities Law are modeled after sections 17(a)(1) through (a)(3) of the federal Securities Act of 1933, Illinois courts look to federal securities fraud case law in interpreting those sections of the Illinois Securities Law." Tirapelli v. Advanced Equities, Inc. 813 N.E.2d 1138, 1142 (Ill. App. Ct. 2004). |
| Kan. Stat. Ann. § 17-12a509 | Section 10(b), '34 Act | "The elements for making a claim under the Kansas Uniform Security Act are essentially the same as those for making a section 10(b) claim." Simmons Investments, Inc. v. Conversational Computing Corp., No. 09-CV-2345, 2011 WL 673759, at *6 (D. Kan. Feb. 17, 2011) (applying same standard of review to Securities Exchange Act section 10(b) claim and state securities fraud claims). |
| Tex. Rev. Civ. Stat. Ann. art. 581, § 33 | Section 10(b), '34 Act | "Because the state and federal statutes contain virtually the same wording, decisions of federal courts applying the federal law are reliable guides to application of the comparable state provisions." Anheuser-Busch Cos. v. Summit Coffee Co., 858 S.W.2d 928, 939 (Tex. App. 1993). |

**ARGUMENT**

## I.    THE BOARD FAILS TO PLEAD AN ACTIONABLE MISREPRESENTATION OR OMISSION.

        To state a claim, the Board must plead facts sufficient to show that defendants made a material misstatement or omitted to state a material fact that is necessary to make defendants' statements not misleading.  (See 15 U.S.C. §§ 77k, 77l; Cal. Corp. Code § 25401; 815 Ill. Comp. Stat. Ann. 5/12(G); Kan. Stat. Ann. § 17-12a509; Tex. Rev. Civ. Stat. Ann. art. 581, § 33.)  The offering documents must be considered in their entirety—including any

warnings or cautionary statements—to determine whether they contain actionable misstatements or omissions.  See, e.g., Olkey v. Hyperion 1999 Term Trust, Inc., 98 F.3d 2, 5 (2d Cir. 1996) ("It is undisputed that the prospectuses must be read 'as a whole.'") (quoting McMahan & Co. v. Wherehouse Ent't., Inc., 900 F.2d 576, 579 (2d Cir. 1990)).

### A.    The Board Fails to Allege a Single Actionable Misrepresentation.

1.    The Board's Misrepresentation Claims Must Be Dismissed Because the Offering Documents Disclosed that Some Mortgage Loans Would Not Comply with the General Criteria Described Therein.

The Board claims that the J.P. Morgan Defendants falsely represented the risk profile of the mortgage loans backing its Certificates because some (unstated) portion of those loans did not conform to the underwriting guidelines, LTV ratios and other criteria summarized in the offering documents.[23]

Contrary to these allegations, however, the offering documents did not state that all the mortgage loans would conform to any specified underwriting guidelines, LTV ratios or other criteria.  Rather, they described the "general" practices of Originators and the aggregate characteristics of the loan pools (see supra n.6),  and they disclosed that the mortgage loan purchase and sale contracts underlying each transaction included "repurchase or substitute" provisions pursuant to which Originators would be obligated to repurchase loans that did not conform to contractual representations and warranties regarding LTVs, appraisals, underwriting, and the like.  The existence of such repurchase obligations made clear to investors that there

---

[23] See Compl. ¶ 299 (statements concerning evaluation of borrowers' ability to repay were allegedly untrue because "the Originators did not adhere to the stated underwriting guidelines"), ¶ 306 (statements concerning reduced documentation programs were allegedly untrue because "the Originators systematically disregarded their underwriting guidelines"), ¶ 312 (statements concerning loan-to-value ratios were allegedly untrue because "the Originators did not adhere to the maximum loan-to-value ratios as represented in the offering document"), ¶ 318 (statements concerning credit enhancement were allegedly untrue because "due to the Originators' systematic disregard of underwriting standards, the mortgages in the pools were fatally impaired at the outset").

would be loans in the pools that did not conform to the Originators' underwriting guidelines.

See Lone Star Fund V (US), L.P. v. Barclays Bank PLC, 594 F.3d 383, 389–90 (5th Cir. 2010)

("'repurchase or substitute' clauses" fundamentally "change the nature" of disclosures about

underlying mortgages by making clear to all investors that the mortgage pools would contain

noncompliant loans); see also Footbridge Ltd. v. Countrywide Home Loans, Inc., No. 09-cv-

4050, 2010 WL 3790810, at *16 (S.D.N.Y. Sept. 28, 2010) (same).

        In short, by disclosing an express mechanism to address noncompliant loans, the offering

documents made plain to any reasonable investor that there would be noncompliant loans (why

else have the repurchase mechanism?).  The Credit Unions, as "sophisticated investor[s] . . . have

no basis to ignore these provisions or their consequences" and, therefore, no basis for asserting

that the offering documents promised that the loans would be free of problems.  Lone Star, 594

F.3d at 389.  The Board does not (and cannot) plead any definitive representation to the

contrary—let alone a misrepresentation about the characteristics of the loans in the pools—and

its misrepresentation claims therefore must be dismissed.[24]  Id.

        2.    The Board Fails To Plead an Actionable Misrepresentation Regarding the
              Evaluation of the Borrowers' Likelihood to Repay the Mortgage Loans.

        The Board's allegations regarding underwriting disclosures fail for four reasons.

        First, as discussed above, every offering included "repurchase or substitute"

---

        [24] Some courts have rejected arguments that under Lone Star a plaintiff has no securities claim unless the
exclusive loan repurchase remedy has failed to function properly.  Those cases did not address, and thus have no
bearing on, the argument advanced here that the disclosure of the commitment to repurchase nonconforming loans
warned investors that there would be nonconforming loans and, therefore, that the alleged presence of
nonconforming mortgage loans in the underlying pools cannot demonstrate the existence of a misrepresentation.
One court has held that "[t]he 'sole remedy' provision does not undercut the plaintiff's showing that the alleged
misrepresentations discussed above were material".  Emps.' Ret. Sys. of the Gov't of the V.I. v. J.P. Morgan Chase
& Co., No. 09-cv-03701, 2011 WL 1796426, at *12 (S.D.N.Y. May 10, 2011).  Here, however, the J.P. Morgan
Defendants do not argue that the repurchase disclosures rendered misstatements immaterial, but rather that these
disclosures show that the offering documents contained no misstatements at all.

provisions acknowledging that there would be flaws in the underwriting process and providing a means to correct those flaws.  (See supra § I.A.1.)  The presence of such provisions defeats the Board's claims.  See Lone Star, 594 F.3d at 389; Footbridge, 2010 WL 3790810, at *16.

Second, the Complaint fails to tie any alleged underwriting defect to any offering at issue.  The Complaint does not identify a single allegedly defective loan, let alone allege that any loan-specific underwriting practices conflicted with the disclosures in the offering documents.  Instead, the Board relies on conclusory statements regarding the Originators' general underwriting practices, relying exclusively on press articles and allegations from other lawsuits.[25]  (Compl. ¶¶ 92–235.)  The Southern District of New York, in New Jersey Carpenters Health Fund v. NovaStar Mortgage, Inc., No. 08-cv-5310, 2011 WL 1338195, at *11 (S.D.N.Y. March 31, 2011) rejected essentially identical allegations as insufficient to state a claim because they "make[] no allegations tying [the plaintiff's] '33 Act claims to that specific . . . purchase."  In fact, the NovaStar court rejected the same kind of general allegations that the Board makes here regarding Originators' "systematic disregard" for underwriting practices, finding that such allegations were "conclusory in nature" and could not form the basis of a valid claim:

> Plaintiff alleges that the NovaStar Defendants systematically failed to comply with its underwriting guidelines, including that: "NovaStar made no attempt to confirm the standards used by mortgage brokers;" "NovaStar originators were instructed to push, onto unfit and unqualified borrowers, ARMs which readjusted after two or three years to significantly higher rates;" "NovaStar was not nearly as thorough in obtaining and verifying documentation as [the stated underwriting guidelines] imply;" "NovaStar failed to confirm that [home loan] appraisers [with conflicts of interest] were following the guidelines described;" "NMI was very liberal in granting exceptions to its underwriting standards;" "tremendous pressure [was] placed on underwriters to close as many loans as possible;" and NMI "issued bonuses for underwriters based solely on the number of loans

---

[25] Even then, the Board refers to loans that were originated well before the deals at issue.  See, e.g., Compl. ¶¶ 109–11.

> they reviewed." As a result of these failures, Plaintiff alleges that the
> underlying mortgage loans were not as valuable as Plaintiff was led to
> believe.  The Court agrees that Plaintiff's allegations are conclusory in
> nature.

Id. at *10 (internal citations omitted).  The same is true here.

Third, the offering documents disclosed that the Originators made exceptions to their underwriting guidelines.  For example, the C-BASS 2006-CB7 Prospectus Supplement states that "[o]n a case-by-case basis, exceptions to the New Century Underwriting Guidelines are made where compensating factors exist.  It is expected that a substantial portion of the Mortgage Loans will represent these exceptions."  (C-BASS 2006-CB7 (Ex. 2) at S-68 (emphasis added); see also Ex. 17 at 6; Ex. 18 at A.4.)  Similarly, the IndyMac INDX Mortgage Loan Trust 2006-AR29 Prospectus Supplement discloses that "[u]nderwriting procedures vary by channel of origination. . . .  Mortgage loans that do not meet IndyMac Bank's guidelines may be manually re-underwritten and approved under an exception to those underwriting guidelines."[26]  The Board's claims that the Originators made loans that did not conform to their underwriting guidelines simply cannot stand given that the Originators are alleged to have done exactly what the offering documents said they had done:  exercised discretion to make exceptions to the underwriting guidelines.

Fourth, the Board fails to plead facts sufficient to state a plausible claim that the Originators "systematically disregarded" their underwriting guidelines.[27]  Instead, the Board

---

[26] INDXMLT 2006-AR29 (Ex. 3) at S-47, S-45 ("Mortgage loans that are acquired by IndyMac Bank are underwritten . . . according to IndyMac Bank's underwriting guidelines, . . . or pursuant to an exception to those guidelines"; "IndyMac Bank has procedures to override an e-MITS decision to allow for compensating factors"; "Traditional underwriting decisions are made by individuals authorized to . . . allow mortgage loans not otherwise meeting IndyMac Bank's guidelines.") (emphasis added); see also Ex.17 at 6; Ex. 18 at A.4.

[27] To the extent the complaint sounds in fraud, the Board must plead such facts **with particularity** to comply with Federal Rule of Civil Procedure 9(b)—which the Board fails to do.  While allegations of fraud most commonly are made in support of claims for which fraud is a necessary element (such as securities fraud claims under Section

alleges that "evidence of [systematic disregard of underwriting guidelines] is found in, among other things, the surge in delinquencies and defaults shortly after the offering, the rate at which actual losses outpaced expected losses within the first year after the offering, [and] the collapse of the credit ratings".  (Compl. ¶ 299.)  But the alleged defaults, losses and ratings downgrades happened during the worst economic crisis in nearly a century, which cost scores of mortgagors their jobs, savings and home equity.  The Board's allegations are thus "not only compatible with, but indeed . . . more likely explained by" economic conditions—namely, the collapse of the housing market and severe distress in the broader economy—than anything to do with underwriting.  Iqbal, 129 S. Ct. at 1950; see also NovaStar, 2011 WL 1338195, at *11.

Indeed, until it decided to sue the J.P. Morgan Defendants, the Board itself publicly attributed the poor performance of the Credit Unions' RMBS portfolio to market factors.  For example, in an Internet video presentation entitled "Corporate Credit Unions; How Did We Get Here", the NCUA explained that the global economic crisis caused the decline in value of the Credit Unions' RMBS:  "To understand what happened to cause the losses associated with the private-label mortgage-backed securities that were held by corporate credit unions **we need to now take look at the overall global economic crisis that emerged in 2007 and 2008**."[28]  Thus, **even according to the NCUAB**, economic conditions—not any undisclosed

---

10(b) of the Securities Act of 1934), they can also form the basis for claims under the Securities Act of 1933—and, when they do, the plaintiff must plead fraud with particularity.  See, e.g., Cal. Pub. Emps.' Ret. Sys. v. Chubb Corp., 394 F.3d 126, 161 (3d Cir. 2004) ("It does not logically follow from the fact that fraud is not a necessary element of a section 11 claim that a section 11 claim cannot hinge on an allegation of fraud.  Rule 9(b) does not discriminate between various allegations of fraud.  Instead, it applies to **any claim that includes averments of fraud or mistake**. . . .  [W]hen § 11 and § 12(2) claims are grounded in fraud rather than negligence, Rule 9(b) applies.'") (quotation omitted, emphasis added); accord Schwartz v. Celestial Seasonings, Inc., 124 F.3d 1246, 1251–52 (10th Cir. 1997) ("Assuming without deciding that this court adopts the Shapiro analysis" and finding that Rule 9(b) did not apply to Section 11 claim that alleged no fraud but rested on allegations that the defendant did not exercise "reasonable care" or conduct a "reasonable investigation" of statements in the offering documents).

[28] NCUA Presentation, "Corporate Credit Unions; How Did We Get Here", at http://www.youtube.com/user/NCUAchannel#p/u/14/IjvUngJzQYI (Ex. 46) (emphasis added).  The Court may take

flaws in the mortgage origination or securitization process—caused the disruptions that the Board points to as "evidence" of abandoned underwriting guidelines.[29] This so-called "evidence" cannot plausibly support any claim for relief.  NovaStar, 2011 WL 1338195, at *11.

       3.      The Board Fails To Plead an Actionable Misrepresentation Regarding Reduced Documentation Programs.

The Board alleges that disclosures regarding reduced documentation programs— i.e., programs in which borrowers were not required to produce complete documentation of their income or assets—were misleading "because regardless of the documentation program purportedly employed, the Originators systematically disregarded their underwriting guidelines". (Compl. ¶ 306.)  Besides simply repeating (and so failing for the same reasons as) the Board's general underwriting disclosure claims (see supra § I.A.2), these allegations fail to state a claim because the offering documents explicitly disclosed that reduced documentation programs required little or no verification of a borrower's income, assets or employment.[30]  The offering

---

judicial notice of materials that are not subject to reasonable dispute and that are matters of public record in assessing the plausibility of a complaint.  See, e.g., Battle v. A&E Television Networks, LLC, No. 11cv0013, 2011 WL 3205359, at *1, *4–6 (M.D. Tenn. July 27, 2011) ("[I]n determining whether a complaint sets forth a plausible claim, a court may consider not only the allegations, but 'may also consider other materials that are integral to the complaint, are public records, or are otherwise appropriate for the taking of judicial notice.'") (quoting Ley v. Visteon Corp., 543 F.3d 801, 805 (6th Cir. 2008) (taking judicial notice of allegedly defamatory television program to determine whether the plaintiff had stated a plausible claim of defamation).)  The Court may also take judicial notice of the fact of the housing crisis and the economic downturn.  See, e.g., In re Merrill Lynch & Co. Research Reports Sec. Litig., 289 F. Supp. 2d 416, 421 n.6 (S.D.N.Y. 2003) (Pollack, J.) ("The Court may take judicial notice of the existence of the internet bubble and its subsequent crash.")

[29] A number of courts have allowed allegations of "systematic disregard of underwriting guidelines" to proceed to narrowly-tailored discovery.  See, e.g., Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp., 632 F.3d 762, 774 (1st Cir. 2011); In re IndyMac Mortg.-Backed Sec. Litig., 718 F. Supp. 2d 495, 510 (S.D.N.Y. 2010); Boilermakers Nat'l Annuity Trust Fund v. WaMu Mortg. Pass Through Certificates, Series AR1, 748 F. Supp. 2d 1246, 1255 (W.D. Wash. 2010).  But those courts were not faced with a situation, like here, where the plaintiff itself had attributed any problems with its RMBS investments to the global economic crisis.  The J.P. Morgan Defendants respectfully submit that these unique facts require a different "judgment call" than that made in other RMBS cases.  Nomura, 632 F.3d at 773.

[30] See JPALT 2006-A2 (Ex. 4) at S-30, S-34 to S-35, S-37 to S-38, S-40, S-43 to S-46, 14–15, 23 ("A lender may . . . originate loans pursuant to alternative sets of underwriting criteria under reduced or limited documentation programs", under which "certain documentation concerning income/employment and asset verification is reduced or excluded."); see also Ex. 17 at 10; Ex. 18 at A.8.

documents also warned of the risks associated with those types of loans,[31] and disclosed that they would constitute a significant—and sometimes overwhelming—majority of the loans in the pools.  For example, the American Home Mortgage Assets Trust 2007-3 prospectus supplement disclosed that <u>more than 96 percent</u> of the loans backing the tranche purchased by WesCorp were reduced documentation loans that "may result in losses or shortfalls to be incurred on the related certificates".[32]  Because the risks associated with reduced documentation loans were fully disclosed, they cannot form the basis of a misrepresentation claim.  <u>See, e.g.</u>, <u>In re Progress Energy, Inc.</u>, 371 F. Supp. 2d 548, 552 (S.D.N.Y. 2005) ("[I]t is indisputable that there can be no omission where the allegedly omitted facts are disclosed.").

4.   The Board Fails To Plead an Actionable Misrepresentation Regarding Loan-to-Value Ratios and Appraisal Practices.

The Board alleges misstatements as to the accuracy of appraisals and loan-to-value ratios.  (<u>See</u> Compl. ¶¶ 238 (alleging that statements were untrue as to "the

---

[31] <u>See</u> JPALT 2006-A2 (Ex. 4) at S-37 to S-38, 14–15 ("The inclusion of [reduced documentation and verification] Mortgage Loans may present certain risks that are not present in [Fannie Mae- or Freddie Mac-conforming underwriting] programs. . . .  The Mortgage Loans originated using CHF Alternative A Underwriting Policies described above may experience greater rates of delinquency, foreclosure and loss than mortgage loans required to satisfy more stringent underwriting standards. . . .  Alt-A mortgage loans may have some of the characteristics and risks of subprime mortgage loans" including deficient credit history and/or capacity to repay and "may be likely to experience rates of delinquency, foreclosure and bankruptcy that are higher than those experienced by loans underwritten in accordance with Fannie Mae or Freddie Mac guidelines."); <u>see also</u> Ex. 17 at 11; Ex. 18 at A.9.

[32] AHMAT 2007-3 (Ex. 1) at S-32, A-29 ("Documentation Programs of the Group I-2 Loans" table, at "# of Loans" column, disclosed that 827 out of 861 Group I-2 loans, or 96.1%, were originated under programs requiring less than full income and full asset documentation and/or verification (<u>i.e.</u>, only 34 loans, or 3.9%, were originated under the full income / full asset ("FIFA") documentation program)); Compl. ¶ 65 & Table 5 (Credit Unions purchased Class I-2A-2 Certificates, corresponding to the Group I-2 loans).  <u>See also</u> JPALT 2007-A1 (Ex. 8) at A-2-2 ("Loan Documentation" table, at "Percent of Aggregate Principal Balance Outstanding" column, disclosed that 90.66% of Pool 1 loans, by principal balance outstanding, were originated under programs requiring less than full income and full asset documentation and/or verification (<u>i.e.</u>, only 9.34% of Pool 1 loans were originated under the "Full" documentation program)); Compl. at ¶ 65 & Table 5 (Credit Unions purchased Class 1-A-1A Certificates, corresponding to the Pool 1 loans).  <u>See also generally</u> Ex. 17 at 12; Ex. 18 at A.10; Compl. ¶ 65 & Table 5 (pp. 22–29) ("The shadowed rows [in Table 5] reflect the group of mortgages in the pool underlying the specific tranches purchased by the Credit Unions").

accurate calculation of 'loan-to-value' ratio for the mortgaged property and the accuracy of appraisals"), 307–312 (Originators "encouraged inflated appraisals").)  Those allegations fail to state a claim.

       Appraisals (and resulting loan-to-value ratios) are not statements of fact; they are subjective statements of opinion as to the value of a particular property.  See, e.g., Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp., 632 F.3d 762, 774 (1st Cir. 2011); Tsereteli v. Residential Asset Securitization Trust 2006-A8, 692 F. Supp. 2d 387, 393 (S.D.N.Y. 2010); N.J. Carpenters Health Fund v. DLJ Mortg. Capital Inc., No. 08 Civ. 5653, 2010 WL 1473288, at *7–8 (S.D.N.Y. Mar. 29, 2010).  Repeating those subjective opinions in offering documents does not give rise to liability—even if appraised values subsequently decline—absent specific allegations that the appraisers did not actually believe their opinions at the time they gave them.  See e.g., IndyMac, 718 F. Supp. 2d at 511 (citing Shields v. Citytrust Bancorp, 25 F.3d 1124, 1131 (2d Cir. 1994)).

       In the RMBS context, many courts have dismissed appraisal claims for precisely that reason.  See Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp., 658 F. Supp. 2d 299, 308 (D.  Mass. 2009) (dismissing loan-to-value ratio claims "for the evident reason that [loan-to-value claims are] dependent upon . . . unsubstantiated allegations . . . with regard to the appraisal methods"); IndyMac, 718 F. Supp. 2d at 509; Tsereteli, 692 F. Supp. 2d at 393 ("[N]either an appraisal nor a judgment that a property's value supports a particular loan amount is a statement of fact.  Each is instead a subjective opinion based on the particular methods and assumptions the appraiser uses."); N.J. Carpenters, 2010 WL 1473288, at *7–8; see also Nomura, 632 F.3d at 774–75.

       The Board's allegations warrant the same outcome.  The Board does not allege

that <u>any</u> appraiser deliberately inflated the value of <u>any</u> property in connection with <u>any</u> of the

Certificates at issue.  Instead, the Board's only appraisal allegations are conclusory citations to

generalized allegations taken from other lawsuits and public reports.  Such allegations are not

sufficient to state a claim.  See <u>Tsereteli</u>, 692 F. Supp. 2d at 393 (allegations quoting a third party

report criticizing defendant's appraisals failed to state a claim).

      In any event, the offering documents disclosed that appraisals and loan-to-value

ratios could fluctuate and were not reliable indicators of potential losses.[33]  The offering

documents warned that "[n]o assurance can be given that the value of any Mortgaged Property

[would] remain at the level that existed" at the time of appraisal.[34]  The offering documents also

warned that loan-to-value ratios "might not be a reliable indicator of the rates of delinquencies,

foreclosures and losses that could occur".  (<u>See</u> Ex. 17 at 9; Ex. 18 at A.7.)  Given these

disclosures, the Board "cannot credibly claim a lack of fair warning" that the appraisals

potentially were inaccurate or subject to change.  <u>Nomura</u>, 658 F. Supp. 2d at 307–08.

    5.    <u>The Board Fails To Plead an Actionable Misrepresentation Regarding Credit Enhancement.</u>

      The Board does <u>not</u> allege that credit enhancement measures failed to function as

described in the offering documents.  Rather, the Board alleges that the "<u>protection</u> allegedly

---

[33] <u>See</u> JPALT 2006-A2 (Ex. 4) at S-19, S-22, S-46, 8, 14, 22 ("We cannot assure you that the values of the mortgaged properties have remained or will remain at levels in effect on the date of origination of the related mortgage loans. . . .  No assurance can be given that the value of any Mortgaged Property has remained or will remain at the level that existed on the appraisal or sales date.  If residential real estate values generally or in a particular geographic area decline, the Loan-to-Value Ratios might not be a reliable indicator of the rates of delinquencies, foreclosures and losses that could occur with respect to the Mortgage Loans."); <u>see also</u> Ex. 17 at 7–9; Ex. 18 at A.5–A.7.

[34] <u>See</u> JPALT 2007-S1 (Ex. 10) at S-17, 22; JPMAC 2006-HE1 (Ex. 11) at S-11, S-20, S-27, 18 ("We cannot assure you that the values of the properties have remained or will remain at levels on the date of origination of the related mortgage loans."); AHMAT 2007-3 (Ex. 1) at S-24, 10 ("the value of a mortgaged property as of the date of initial issuance of the related series of securities may be less than the Value determined at loan origination, and will likely continue to fluctuate from time to time based upon changes in economic conditions and the real estate market"); <u>see also</u> Ex. 17 at 8; Ex. 18 at A.6.

offered by the credit enhancement" was "illusory" because of "the Originators' systematic

disregard of underwriting standards". (Compl. ¶ 318 (emphasis added).) That allegation is

derivative of the Board's underwriting claims, and fails for the reasons discussed above. (See §

I.A.2.) The Board's credit enhancement allegations also fail because the disclosures warned

investors that credit enhancement measures might be insufficient to cover losses. For example,

the Prospectus Supplement for JPMAC 2007-HE1 stated that "we cannot assure you that the

applicable credit enhancement will adequately cover any shortfalls in cash available to pay your

certificates as a result of delinquencies or defaults on the mortgage loans . . . . If substantial

losses occur as a result of defaults and delinquent payments on the mortgage loans, you may

suffer losses." (JPMAC 2007-HE1 (Ex. 12) at S-16; see also Ex. 17 at 13; Ex. 18 at A.11.) The

Board cannot sue for the occurrence of disclosed risks. See, e.g., Grossman v. Novell, Inc., 120

F.3d 1112, 1121 (10th Cir. 1997) (dismissing claim where company "made specific, repeated

disclosures regarding the precise subjects addressed in the alleged misstatements").

**B.     The Board Fails To State an Actionable Omission Claim Because the Offering Documents Disclosed the Very Risks the Board Alleges Were Concealed.**

The crux of the Board's omission claims is that "the RMBS were significantly

riskier than represented in the Offering Documents". (Compl. ¶ 6.) That is not true. The J.P.

Morgan Defendants disclosed the very risks that the Board now claims were concealed. As a

result, the Board's claims must be dismissed. See, e.g., Spears v. Metro. Life Ins. Co., No.

2:07-CV-88, 2009 WL 2408928, at *8 n.5 (N.D. Ind. Aug. 4, 2009) (plaintiffs failed to state a

claim where the prospectus "sets forth the very information that Plaintiffs allege that [defendant]

failed to disclose"); In re Progress Energy, Inc., 371 F. Supp. at 552 ("[I]t is indisputable that

there can be no omission where the allegedly omitted facts are disclosed."); In re Keyspan Corp.

Sec. Litig., 383 F. Supp. 2d 358, 377 (E.D.N.Y. 2003) ("Even at the pleading stage, dismissal is

appropriate where the complaint is premised on the nondisclosure of information that was actually disclosed."); Sable v. Southmark/Envicon Capital Corp., 819 F. Supp. 324, 333 (S.D.N.Y. 1993) (finding no cause of action where "[t]he naked assertion of concealment of material facts [was] contradicted by published documents which expressly set forth the very facts allegedly concealed").

The Board alleges that the offering documents failed to disclose that Originators: (i) deviated from stated underwriting standards; (ii) did not effectively evaluate the borrowers' ability or likelihood to repay the loans; (iii) did not properly evaluate the impact of the borrowers' debt-to-income ratio; and (iv) granted numerous exceptions to the underwriting guidelines. Each of those risks was, in fact, disclosed in the offering documents.[35]

- **Failure to Adhere to Underwriting Standards:** The offering documents disclosed that the mortgage loan purchase and sale contracts underlying each transaction included "repurchase or substitute" provisions pursuant to which Originators would be obligated to repurchase loans that did not conform to contractual representations and warranties regarding LTVs, appraisals underwriting, and the like. These repurchase obligations "change[d] the nature" of the disclosures about the underlying mortgages by making clear to investors that there would be loans in the pools that did not conform to the Originators' underwriting guidelines. Lone Star, 594 F.3d at 390 (emphasis added). Moreover, the offering documents disclosed that Originators made loans to borrowers who did "not strictly qualify[] under the underwriting risk category

---

[35] In the aggregate, the offering documents for the Certificates contained hundreds of pages of detailed descriptions of the risks associated with the RMBS at issue. The J.P. Morgan Defendants have attached as Appendix A (Exhibit 18) to this Brief a compilation of the relevant disclosures contained in the offering documents.

guidelines"—and that, in some cases, "a substantial portion of the Mortgage Loans represent such underwriting exceptions."  (JPMAC 2006-HE1 (Ex. 11) at S-60; see also Ex. 17 at 6; Ex. 18 at A.4.)

- **Failure to Evaluate Borrowers' Repayment Ability:**  The offering documents disclosed that the Originators' underwriting guidelines were "less stringent" than standards promulgated by Fannie Mae and Freddie Mac.  The offering documents also informed investors that the Originators used a variety of "reduced documentation" and other alternative lending programs and expressly warned investors that there was little historical experience with such non-traditional mortgage loans, that delinquencies and default rates could thus be higher than anticipated (see Ex. 17 at 10; Ex. 18 at A.8), and that the non-traditional loans allowed borrowers to purchase homes they otherwise would be unable to afford (see Ex. 17 at 11; Ex. 18 at A.9).

- **Failure to Evaluate Debt-to-Income:**  The offering documents disclosed, among other things, that "[a] prospective borrower may be eligible for a loan approval process that limits or eliminates [the Originator's] standard disclosure or verification requirements or both."  Such programs often did not require borrowers to provide evidence of their income, assets, employment or outstanding debt.  The offering documents disclosed the composition of the loan pools underlying the offerings and Certificates at issue.  In most of the relevant loan pools, the majority (and, in some cases, the vast majority) of loans were made pursuant to such alternative lending programs.  (See Ex. 17 at 10, 12; Ex. 18 at A.8, A.10.)

27

- **<u>Loans Made Pursuant to Underwriting Exceptions:</u>**  The offering documents disclosed that exceptions to underwriting guidelines were "permitted" and "made" and that the guidelines "may be varied in appropriate cases".  They also disclosed that loans could be considered in compliance with underwriting standards "even if one or more specific criteria included in those underwriting standards were not satisfied," as long as "the mortgage loan is considered to be in substantial compliance with the underwriting standards."  Such exceptions were likely to make up a "substantial portion" of the underlying loans.  (<u>See</u> Ex. 17 at 6; Ex. 18 at A.4.)

These disclosures defeat the Board's central claim that the Credit Unions were not told of the risks associated with the loans underlying their RMBS investments.  <u>See</u> <u>Footbridge</u>, 2101 WL 3790810, at *12 (where offering documents disclosed that mortgage loans "would be issued under a 'more flexible' set of underwriting guidelines," allegations that defendants were "too flexible in their underwriting decisions" did not support misrepresentation claims).

## C.    The Board Fails To Plead Materiality.

The Board's claims must be dismissed because it fails to allege facts sufficient to demonstrate that a "reasonable investor" would have viewed the alleged misrepresentations or omissions as "<u>significantly</u> alter[ing] the total mix of information".  <u>See</u> <u>City of Phila. v. Fleming Cos., Inc.</u>, 264 F.3d 1245, 1265 (10th Cir. 2001) (emphasis added) (citation omitted); <u>see also</u> <u>Grossman</u>, 120 F.3d at 1119; <u>Jayhawk Capital Mgmt., LLC v. LSB Indus., Inc.</u>, No. 08-2561-EFM, 2009 WL 3766371, at *11 (D. Kan. Nov. 10, 2009) (courts "do not hesitate to dismiss securities claims where the representation is plainly immaterial") (citing <u>Grossman</u>).  As the Tenth Circuit explained in <u>Garcia v. Cordova</u>, 930 F.2d 826 (10th Cir. 1991), the standard for

28

materiality in securities cases is high because "a minimal standard would result in avalanches of information that would bury [investors] in trivia, a result the Court has condemned as 'hardly conducive to informed decisionmaking'". 930 F.2d at 829 (citation omitted) (quoting TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 448–49 (1976)).

The Credit Unions were privy to national press coverage—as well as warnings from the Board itself—regarding the trend toward liberal underwriting standards and the risks of RMBS backed by nontraditional loans. (See supra Stmt. of Facts C.) Every offering included extensive warnings about the existence of nonconforming loans and the risk of losses if appraised values were to decline, and disclosed not only that the Certificates were based on nontraditional loan products, but that in most cases, reduced documentation mortgages outnumbered full-documentation mortgages by a significant margin. (See supra Stmt. of Facts B.) Indeed, U.S. Central, WesCorp and Members United bought Certificates in April 2006 for which actual losses spiked to exceed expected losses barely four months after the offering—which the Board alleges is "evidence" of flawed underwriting practices. (See Compl. at Table 1 & Figure 2.) And yet the Credit Unions continued to purchase RMBS for months thereafter.

The Board even has sued the officers and directors of WesCorp for breaching their fiduciary duties by acquiring an "overwhelming concentration" of risky RMBS based on adjustable-rate mortgages, when, "[b]eginning as early as March 2005 . . . [WesCorp officers] were aware that the investment credit spreads for private label MBS had been generally shrinking". (Second Amended Complaint at ¶¶ 39, 96, NCUAB v. Siravo, Case No. CV10-01597, ECF No. 116 (C.D. Cal. February 22, 2011) (Ex. 44).) Tellingly, in its opposition to a motion to dismiss filed by WesCorp officers in that case, the Board unequivocally stated that "**[b]y the summer of 2005**, the Officer Defendants were also aware that: (1) the reset shock

experienced by Option ARM loans increases their credit risk; (2) **the credit quality of the Option ARM MBS loan pools was deteriorating**; and (3) **a drop in housing demand could result in a decrease in real estate values and credit losses on existing Option ARM loans** because the borrowers would be unable to refinance." (Mem. in Opp'n to Mot. to Dismiss at 13, NCUAB v. Siravo, Case No. CV10-01597, ECF No. 128 (C.D. Cal. May 12, 2011) (Ex. 45) (emphases added) (citations omitted); see also id. ("**By March 2005** and continuing through 2006, [senior WesCorp officers] were aware that: (1) investment credit spreads were tightening significantly; (2) good investments were becoming increasingly hard to find; (3) interest rates were beginning to rise; and (4) **the 'housing bubble' might be dangerously close to bursting**.") (emphases added) (citations omitted).)

   In short, the "total mix" of information available to the Credit Unions included extensive risk disclosures in the offering documents, nationwide press coverage of underwriting practices, warnings from the Board, and the Credit Unions' own experience with money-losing Certificates. One more disclaimer related to already-disclosed risks could not plausibly have affected the total mix of information available to a reasonable investor. See Rubke v. Capitol Bancorp Ltd., 551 F.3d 1156, 1163–64 (9th Cir. 2009).

## II. THE BOARD'S CLAIMS ARE TIME-BARRED.

   As described in the table below, the statutes of limitations for the claims at issue expire one, two or three years after a plaintiff is on inquiry notice of its claims.

| Statute | Statute of Limitations | Inquiry Notice |
|---|---|---|
| Securities Act Section 11 and Section 12(a)(2) claims | 1 year after inquiry notice; 3-year statute of repose. See 15 U.S.C. § 77m. | "[I]nquiry notice triggers an investor's duty to exercise reasonable diligence and the one-year statute of limitations period begins to run once the investor, in the exercise of reasonable diligence, should have discovered the facts underlying the alleged fraud." Caprin v. Simon Transp. Servs., Inc., 99 Fed. App'x 150, 155 (10th Cir. 2004) (internal |

| Statute | Statute of Limitations | Inquiry Notice |
|---------|------------------------|----------------|
| | | quotation marks omitted).  A plaintiff is on inquiry notice when there are "sufficient storm warnings [including, 'in the proper circumstances, even rumors or vague charges'] to alert a reasonable person to the possibility that there were either misleading statements or significant omissions involved in the sale of the security."  Id. at 156 (alterations and internal quotation marks omitted).  Thus, "inquiry notice . . . may exist before a reasonable investor is able to discover the facts underlying the alleged fraud."  Sterlin v. Biomune Sys., 154 F.3d 1191, 1202 n.19 (10th Cir. 1998); see also id. at 1204 (a negative magazine article about defendant placed plaintiffs on inquiry notice even though it did not "discuss each and every aspect of the alleged fraudulent activity", because, "[o]nce the storm clouds gathered, [positive information from the company] refuting the claims in the article could not dissipate them").  In addition, the Securities Act's three-year statute of repose extinguishes liability for any Securities Act claim brought more than three years after the date the security was sold to the public (in the case of Section 11) or purchased (in the case of Section 12(a)(2)), regardless of the date a plaintiff discovers it might have such claims.  See 15 U.S.C. § 77m. |
| Cal. Corp. Code § 25401 | 2 years after inquiry notice; 5-year statute of repose.  See Cal. Corp. Code § 25506(b). | "Inquiry notice arises in a securities action when circumstances suggest to an investor of ordinary intelligence the possibility that he has been defrauded."  Deveny v. Entropin, Inc., 42 Cal. Rptr. 3d 807, 821 (Cal. App. 2006).  "Storm warnings" trigger inquiry notice "whenever there are any financial, legal, or other data, such as public disclosures in the media about the financial condition of the corporation that would tend to alert a reasonable person to the likelihood of fraud."  Id. at 821.  A plaintiff's failure to "perform a reasonable investigation into the possibility of fraud" results in the plaintiff being "charged with the knowledge of what an investor in the exercise of reasonable diligence would have discovered concerning the fraud".  Id. at 822. |
| 815 Ill. Comp. Stat. Ann. 5/12(G) | 3 years after inquiry notice; 5-year statute of repose.  See 815 Ill. Comp. Stat. Ann. 5/13(D). | "The parties agree that, just as in federal securities actions, the limitations begins to run when the plaintiff has 'inquiry notice' of the conduct giving rise to the claim.  This is an objective test: not whether plaintiffs actually knew of the conduct but whether they reasonably should have known."  Grumhaus v. Comerica Sec., Inc., No. 99 C 1776, 2003 WL 21504185, at *2 (N.D. Ill. June 30, 2003) (citations omitted) (applying inquiry notice to claims brought under the Illinois Securities Law).  See also Law v. Medco Research, Inc., 113 F.3d 781, 786 (7th Cir. 1997) ("Suspicious circumstances, |

| Statute | Statute of Limitations | Inquiry Notice |
|---------|------------------------|----------------|
| | | coupled with ease of discovering, without the use of legal process, whether the suspicion is well grounded, may cause the statute of limitations to start to run before the plaintiffs discover the actual fraud".) |
| Kan. Stat. Ann. § 17-12a509 | 2 years after inquiry notice; 5-year statute of repose. See Kan. Stat. Ann. § 17-12a509(j). | The discovery rule is triggered when plaintiffs discover "or reasonably should have discovered the facts necessary to know they had a claim".  Kelly v. Primeline Advisory, Inc., 889 P.2d 130, 138 (Kan. 1995).  See also Ames v. Uranus Inc., No. 92-2170-JWL, 1993 WL 106896, at *4 (D. Kan. Mar. 17, 1993) (finding that claim was time-barred because letter containing financial reports put plaintiff on inquiry notice and "[t]he plaintiffs have not shown how this letter would not give a reasonable person a 'storm warning' that there was a possibility that something was amiss and thus would not constitute sufficient inquiry notice.") (emphasis added). |
| Tex. Rev. Civ. Stat. Ann. art. 581, § 33 | 3 years after inquiry notice; 5-year statute of repose. See Tex. Rev. Civ. Stat. Ann. art. 581, § 33(H). | Inquiry notice occurs "'when a reasonable investor of ordinary intelligence would have discovered the information and recognized it as a storm warning.' . . . [When making this determination,] courts consider the entirety of the transactions in question and the degree of investor sophistication."  Escalon v. World Group Sec., Inc., No. 5:07-CV-214, 2008 WL 5572823, at *4 (N.D. Tex. Nov. 14, 2008) (citations omitted) (internal quotations marks omitted); see also Stone v. Enstam, 541 S.W.2d 473, 478–79 (Tex. App. 1976) (explaining that inquiry notice is triggered when a plaintiff "could reasonably have ascertained" the omitted or misstated facts "from [an accessible] financial report.") |

### A.      The Credit Unions Had Inquiry Notice By February 2007 at the Latest.

As described above, the Board's allegations do not state a claim for relief, and the Complaints should be dismissed on that basis.  But, even if the Board's allegations did state a claim, there were "sufficient storm warnings to alert a reasonable person to the possibility" of misrepresentations by no later than February 2007.[36]  See Caprin, 99 Fed. App'x at 156.

---

[36] The Credit Unions purchased the majority of their RMBS before February 2007.  With respect to purchases occurring after February 2007—i.e., purchases made after the "total mix" of information available to investors already included storm warnings—the Board cannot allege that any allegedly misleading disclosures were material. See supra § I.C.

First, the same general mortgage loan origination allegations upon which the Board now bases its claims—i.e., alleged appraisal bias and weakening underwriting standards— were discussed in numerous public sources, including newspaper articles, media reports, government publications and Congressional testimony, before February 2007.  (See supra Stmt. of Facts C.)  The Board alleges that type of public information is sufficient to state a claim and so by definition it should have put the Credit Unions on inquiry notice by at least February 2007.

Second, the Credit Unions knew the risks of liberalized underwriting practices and the potential for inflated appraisals because the Board itself warned them of those risks:

- In May 2005, the Board and other federal regulators issued credit risk management guidelines that emphasized "risk factors that . . . have attracted scrutiny", including "[l]imited or no documentation of a borrower's assets, employment and income" and "**easing of underwriting standards**".  The guidelines stressed the need to "closely monitor the quality of loans [from third-party lenders] includ[ing] post-purchase underwriting reviews".  The guidelines further stated that "[m]onitoring the quality of loans by origination source, and **uncovering such problems as early payment defaults and incomplete packages, enables management to know if third-party originators are producing quality loans**".  The guidelines also alerted the Credit Unions to the potential for "value shopping", i.e., the "**systematic overvaluation of properties**" resulting from industry use of "several valuation tools [that] may return different values for the same property".  (Joint Press Release, "Credit Risk Management Guidance for Home Equity Lending", May 16, 2005 (Ex. 23) at 1–2, 4– 5 (emphases added).)

- In October 2005, the Board sent a letter to all federally insured credit unions entitled

"Increasing Risks in Mortgage Lending", warning that "**[t]o remain competitive and increase volume, many lenders appear to be loosening their credit standards**" and that this "trend towards liberalizing underwriting standards further increases credit risk".  (October 2005 NCUA Letter to Credit Unions, <u>Increasing Risks in Mortgage Lending</u>, No. 05-CU-15 (Ex. 19) at 8 (emphasis added).)  In the same report, the Board instructed examiners of the Credit Unions' member institutions to "be alert to **changes in underwriting procedures, written or practiced**, indicating an increased appetite for credit risk".  (<u>Id.</u> at 3 (emphasis added).)  The supervisory letter also referred credit unions to several press articles discussing the risks of new mortgage products and liberalized underwriting standards.  (<u>Id.</u> at 1–8.)

- The Board reinforced its warning in October 2006 that the type of nontraditional loans that underlie the Credit Unions' RMBS carried a "significant risk of payment shock and negative amortization" and advised credit unions to "monitor compliance with underwriting standards and exceptions to those standards".  (October 2006 NCUA Letter to Credit Unions, <u>Interagency Guidance on Nontraditional Mortgage Product Risk</u>, No. 06-CU-16, attaching Federal Register Vol. 71, No. 192, at 58615–16 (Ex. 24).)

<u>Third</u>, the Credit Unions had access to monthly trustee reports and other sources of loan performance data, such as ABSNET, for each of the Certificates at issue.  (<u>See</u> <u>supra</u> Stmt. of Facts C.)  According to the Board's own allegations, the trustee reports showed "spike[s] in delinquencies and defaults, which occurred almost immediately after these RMBS were purchased by the Credit Unions", <u>i.e.</u>, for many offerings, in 2006 and early 2007.  (<u>See</u> Compl. at ¶ 66.)  Likewise, as reflected in Figure 2 of the Complaint, the ABSNET data

34

purportedly showed that "actual losses" in the loan pools underlying some Certificates exceeded

"expected losses" ("based on historical data for similar mortgage pools") by as much as 30% in

mid-2006.  (See Compl. ¶¶ 74–84 & Fig. 2.)  By January 2007, the losses sustained by the Credit

Unions' J.P. Morgan Alternative Loan Trust 2006-A2 and 2006-A3 Certificates were

$13,889,919 (against expected losses of $4,035,975) and $10,232,056 (against $1,733,560),

respectively.  (See Compl. Fig. 2.)  Although it cannot plausibly be inferred that these losses and

purported "spikes" in delinquency and default rates mean that the Originators abandoned their

underwriting guidelines (the losses coincided with one of the worst economic downturns in

United States history), the Board alleges otherwise.  But the basis for that allegation—the

"spikes" in actual losses and default rates—was available to the Credit Unions well before

February 2007, putting the Credit Unions on notice of the very claims the Board now asserts.

Fourth, in February 2007, as the housing crisis worsened, the offering documents

began to incorporate additional disclosures explicitly warning that delinquencies were rising and

that some originators were being forced into bankruptcy due to problematic origination practices.

(See supra Stmt. of Facts C.)

In short, by February 2007, the Credit Unions were privy to "storm warnings" that

put them on notice of the basis of the Board's allegations.  Given these "storm warnings", in fact,

it is no surprise that the NCUA-OIG's Material Loss Reviews concluded that the Credit Unions

"**should have** recognized the risk exposure that [their] significant concentration in mortgage-

backed securities represented **earlier than 2007 and 2008**" (Members United MLR (Ex. 39) at

3–4 & U.S. Central MLR (Ex. 42) at 4 (emphases added)) and "**should have** been more vigilant

about investing so heavily in higher risk residential mortgage loans taken out by borrowers with

the questionable ability to repay the mortgages".  (WesCorp MLR (Ex. 40) at 25 (emphasis

35

added).)  In fact, the Board itself has argued that WesCorp was aware "**[b]y the summer of 2005**
. . . that **the credit quality of the Option ARM MBS loan pools was deteriorating; and [that]
a drop in housing demand could result in a decrease in real estate values and credit losses**".
(Mem. in Opp'n to Mot. to Dismiss at 13, <u>NCUAB v. Siravo</u>, Case No. CV10-01597, ECF No.
128 (C.D. Cal. May 12, 2011) (Ex. 45) (emphases added).)

        The Board effectively concedes that this information was sufficient to trigger
inquiry notice, as many of these storm warnings provide the basis of its complaint.  To be sure,
for all the reasons described herein, the J.P. Morgan Defendants believe the Board's allegations
are <u>not</u> sufficient to state a claim for relief.  But the Board cannot have it both ways.  Either this
information is sufficient to support the Board's claims, in which case the Credit Unions were on
inquiry notice by February 2007 at the latest, or it is not, in which case the Board has failed to
state a claim for relief.

     **B.**     **All Claims Brought Pursuant to the Securities Act Are Time-Barred.**

        1.     <u>The Board's Securities Act Claims Are Barred By Section 13.</u>

        Section 13 of the Securities Act provides:  "No action shall be maintained to
enforce any liability created under [Section 11 or 12(a)(2)] of this title unless brought within one
year after the discovery of the untrue statement or the omission, or after such discovery should
have been made by the exercise of reasonable diligence . . . .  In no event shall any such action
be brought . . . more than three years after the security was bona fide offered to the public, or
under [Section 12(a)(2)] of this title more than three years after the sale."  15 U.S.C. § 77m.  "To
comply with Section 13, the plaintiff must plead and prove facts showing that his claim was
timely with respect to both the one year and three year limitations periods."  <u>Anixter v.
Home-Stake Prod. Co.</u>, 939 F.2d 1420, 1434 (10th Cir. 1991) (citation omitted) (vacated on other
grounds by <u>Dennler v. Trippet</u>, 503 U.S. 978 (1992)).

A plaintiff must "plead compliance with Section 13 with particularity", including "the time and circumstances of the discovery of the [fraudulent] statement, the reason why discovery was not made earlier, and the diligent efforts undertaken in making such discovery." Pension Trust Fund for Operating Eng'rs v. Mortg. Asset Securitization Transactions, Inc., No. 10-898, slip op. at 10 (D.N.J. Sept. 29, 2011) (citation omitted) (internal quotation marks omitted). In the RMBS context, plaintiffs must allege the particular time and circumstances of their discovery, and may not "rely[] . . . on general public knowledge of underwriting practices and the other conduct on which the [complaint] is based". In re Morgan Stanley Mortg. Pass-Through Certificates Litig., No. 09 Civ. 2137, slip op. at 20 (S.D.N.Y. Sept. 15, 2011).

The Board does not attempt to plead the time and circumstances of its discovery of the allegedly misrepresented facts, nor does it explain any efforts it undertook in making such discovery. The Board's Securities Act claims should be dismissed on that basis alone.[37] Id.; Pension Trust, No. 10-898, slip op. at 10.

More fundamentally, however, the Board could never comply with the one-year statute of limitations set forth in Section 13 because, as described above, the Credit Unions were on inquiry notice of their claims more than one year before October 2010, when the Board entered into a tolling agreement with the J.P. Morgan Defendants.

---

[37] With respect to the "reason why discovery was not made earlier", the Board refers only to a November 2008 Federal Reserve Board publication noting that "'deteriorating lending standards' and 'the surge in early payment defaults suggests that underwriting . . . deteriorated on dimensions that were less readily apparent to investors.'" (Compl. at ¶ 326.) That is precisely the type of reliance "on general public knowledge of underwriting practices" that fails to state a claim. In re Morgan Stanley, slip op. at 20. In any event, because the Board specifically warned the Credit Unions about loosening underwriting standards in 2005, before they purchased any Certificates at issue, its vague statement that the facts on which it bases its claims were "less readily apparent to investors" is plainly inadequate to satisfy the Board's obligation to plead compliance with Section 13 with particularity.

2.    American Pipe Tolling Does Not Extend the Securities Act Statute of Limitations.

The Board alleges that the Credit Unions were members of a putative class and, therefore, that their claims "are subject to legal tolling of the statute of limitations and statute of repose under the doctrine announced in American Pipe & Constr. Co. v. Utah, 414 U.S. 538 (1974), and its progeny".[38]  (Compl. at ¶ 328.)  That is incorrect.

The Credit Unions were on inquiry notice of their claims no later than February 2007.  As a result, their Securities Act claims expired no later than February 2008—a month before any purportedly tolling class action was filed.  (See Compl. at Table 7 (Plumbers & Pipefitters, filed March 26, 2008).)  See 15 U.S.C. § 77m.  Therefore, American Pipe tolling is wholly irrelevant to the Board's Securities Act claims.  See Anderson v. Unisys Corp., 47 F.3d 302, 308 (8th Cir. 1995) ("The American Pipe rule does not operate to revive stale claims, but rather tolls the limitations period on viable claims while the trial court determines the parameters of the class in any possible class action."); Pub. Emps.' Ret. Sys. of Miss. v. Merrill Lynch & Co., 714 F. Supp. 2d 475, 480–81 (S.D.N.Y. 2010) (denying leave to add additional plaintiffs to a class action where statute of limitations had run because "the claims of any such new plaintiffs would be time-barred").

Moreover, American Pipe tolling applies only to securities for which the putative class representative has standing to sue.  See, e.g., Boilermakers Nat'l Annuity Trust Fund v.

---

[38] The Board seeks to benefit from American Pipe tolling in connection with three pending class actions: (1) Plumbers & Pipefitters' Local #562 Supplemental Plan & Trust v. J.P. Morgan Acceptance Corp. I, No. 08-5675 (N.Y. Sup. Ct.), filed March 26, 2008 and consolidated into No. 08-1713 (E.D.N.Y.) on October 21, 2009 ("Plumbers"); (2) IBEW Local 103 v. IndyMac, BC405843 (Cal. Super. Ct. L.A. County), filed January 20, 2009 and allegedly consolidated into In re IndyMac Mortg.-Backed Sec. Litig., No. 09-4583 (S.D.N.Y.) on May 14, 2009 ("In re IndyMac"); and (3) Fort Worth Emps.' v. J.P. Morgan, No. 600767-2009 (N.Y. Sup. Ct.), filed March 12, 2009 and removed to No. 09-3701 (S.D.N.Y.) with a second amended complaint filed on July 8, 2010 ("Ft. Worth"). (See Compl. at Table 7.)

WaMu Mortg. Pass Through Certificates, Series AR1, 748 F. Supp. 2d 1246, 1259 (W.D. Wash. 2010) ("Courts since American Pipe have found that the statute of limitations does not toll for putative class actions whose named plaintiff lacks standing to advance claims in the first place."); N.J. Carpenters Health Fund v. DLJ Mortg. Capital, Inc., 2010 WL 6508190, at *2 & n.1 (S.D.N.Y. Dec. 15, 2010); Me. State Ret. Sys. v. Countrywide Fin. Corp., 722 F. Supp. 2d 1157, 1166–67 (C.D. Cal. 2010) ("[T]h[is] Court follows multiple other courts that have held in federal cases that the statute [of limitations] is tolled only as to claims where the named plaintiffs had standing."); Palmer v. Stassinos, 236 F.R.D. 460, 465–66 & n.6 (N.D. Cal. 2006) ("[I]t would be beyond the constitutional power of a federal court to toll a period of limitations based on a claim that failed because the claimant had no power to bring it."); In re Colonial Ltd. P'ship Litig., 854 F. Supp. 64, 82 (D. Conn. 1994).  And a plaintiff has standing to sue only with respect to securities that it actually purchased.  See Boilermakers, 748 F. Supp. 2d at 1259; In re Wash. Mut. Sec., Derivative & ERISA Litig., 694 F. Supp. 2d 1192, 1221.

Each tranche in an RMBS offering is a different security, with a different CUSIP number, based on a different group of assets and carrying "a different level of risk" from the other tranches.  (Compl. at ¶ 42.)  Accordingly, at least two courts have held that "[p]laintiffs must establish that they have tranche-based standing"—i.e., that named plaintiffs in RMBS class actions have standing to sue only on behalf of the tranches of Certificates they actually purchased.  Me. State Ret. Sys. v. Countrywide Fin. Corp., No. 2:10-CV-0302, 2011 WL 4389689, at *2 (C.D. Cal. May 5, 2011); see also In re Wash. Mut. Mortg.-Backed Sec. Litig., No. C09-37 MJP, 2011 WL 5027725, at *2 (W.D. Wash. Oct. 21, 2011) ("Each tranche of MBS is an individual security"; therefore, "[p]laintiffs' standing is thus limited only to those tranches in which they actually purchased certificates.").

Here, only one security purchased by the Credit Unions is at issue in any purportedly tolling class action:  IndyMAC INDXMLT 2006-AR 29 Class A1, which is at issue in In re IndyMac.[39]  But In re IndyMac was not filed until May 14, 2009[40]—well after the one-year statute of limitations on the Credit Unions' federal claims already had expired.

3.     The Federal Credit Union Act Does Not Extend the Securities Act Statute of Limitations.

The Federal Credit Union Act ("FCU Act") extends limitations periods for tort claims for "the longer of:  (I) the 3-year period beginning on the date the claim accrues; or (II) the period applicable under State law", and for contract claims for "the longer of (I) the 6-year period beginning on the date the claim accrues; or (II) the period applicable under State law". 12 U.S.C. § 1787(b)(14)(A)(i), (ii).  The FCU Act does not toll the Board's claims.

As an initial matter, the FCU Act applies specifically to tort and contract claims, not to statutory securities claims.  None of the Board's claims sound in tort or contract; rather, each claim is based on a particular statutory provision.  See Burnett v. Sw. Bell Tel., 151 P.3d 837, 843 (Kan. 2007) ("A cause of action may be found in tort or contract, or it may be statutorily created. . . .  [T]his court has repeatedly held that a statutory action in this state is sui

_____

[39] See Compl. ¶ 328 & Table 7; Am. Consolidated Class Action Compl. for Violations of the Securities Act of 1933 at Ex. A, In re IndyMac (listing RMBS at issue by CUSIP No., only one of which—45662DAA3—appears on Table 7 of the Complaint) (Ex. 47); Opinion and Order, filed March 30, 2011, at 17 in Ft. Worth ("Therefore, the plaintiff's claims are dismissed as to all ten offerings other than the 2007-S3 Certificates", which are not listed on Table 7 of the Complaint) (Ex. 48); Consolidated Class Action Compl. ¶ 13 in Plumbers (listing RMBS at issue in that case, none of which appear on Table 7 of the Complaint) (Ex. 49), and JPMAC 2006-WMC3 at S-1 ("Offered Certificates" table indicates that Class A-3 corresponds to CUSIP 46629KAD1, which is not listed on Table 7 of the Complaint) (Ex. 13).

[40] Despite the Board's assertion that IBEW Local 103 v. IndyMac was "consolidated" into the In re IndyMac Mortg.-Backed Sec. Litig., the IBEW action was not consolidated but was, in fact, voluntarily dismissed.  In re IndyMac, 718 F. Supp. 2d at 504–05 (noting voluntary dismissal of IBEW complaint).  The court in In re IndyMac has already held that that "a voluntarily dismissed complaint"—and in particular the IBEW complaint—"does not toll the statute of limitations."  Id.  Consequently, "the relevant complaint for purposes of the statutes of limitations and repose is that filed in [In re IndyMac] on May 14, 2009".  Id.  Therefore, assuming American Pipe tolling did apply here as to the Credit Unions' IndyMac INDXMLT 2006-AR29 Certificates, the relevant date would be May 14, 2009, the day the In re IndyMac complaint was filed.

generis—that is, it is neither a contract action nor a tort action, but something entirely its own."); see also Chevron Chem. Co. v. Voluntary Purchasing Grps., Inc., 659 F.2d 695, 702 (5th Cir. 1981) (distinguishing common law tort decisions on the basis that federal statute at issue "created a sui generis federal statutory cause of action"); Garcia v. Overland Bond & Inv. Co., 668 N.E.2d 199, 206–07 (Ill. App. Ct. 1996) (distinguishing "statutory right of action created by the legislature" from common law tort claims); Carver v. Workers' Comp. Appeals Bd., 217 Cal. App. 3d 1539, 1546–47 (Cal. Ct. App. 1990) (distinguishing "wholly statutory" claims from those "derived from common law" of tort or contract).  Thus, the Board's claims are not subject to the FCU Act extension at all.  Moreover, each of the relevant statutes is governed by a specific statute of limitations.  See 15 U.S.C. § 77m; Cal. Corp. Code § 25506(b); 815 Ill. Comp. Stat. Ann. 5/13(D); Kan. Stat. Ann. § 17-12a509(j); Tex. Rev. Civ. Stat. Ann. art 581, § 33(H).  Those specific statutes of limitations govern the statutory claims asserted here, and cannot be altered by the FCU Act's general extension that, by its very terms, applies only to tort and contract claims. See Morton v. Mancari, 417 U.S. 535, 550–51 (1974) ("[A] specific provision applying to a very specific situation" controls over another provision "of general application" unless there is "clear intention otherwise . . . ."); Bulova Watch Co. v. United States, 365 U.S. 753, 758 (1961).

       Moreover, even if it did apply to statutory claims, the FCU Act could not revive claims that expired before the Credit Unions were placed into conservatorship.  In construing a substantively identical provision in the Financial Institutions Reform, Recovery and Enforcement Act ("FIRREA"), the Tenth Circuit held that "the limitation period . . . may not apply retroactively to revive a claim that is already barred by a state statute of limitations".  FDIC v. Regier Carr & Monroe, 996 F.2d 222, 225 (10th Cir. 1993).  The Board placed the Credit Unions into conservatorship on March 20, 2009 (U.S. Central and WesCorp) and September 24, 2010

(Members United and Southwest Corporate).  (Compl. at ¶ 16.)  Because the Credit Unions were on inquiry notice of their claims no later than February 2007[41] (and, in light of storm warnings and the Board's own cautionary statements, probably much earlier than that), all of the Board's Securities Act claims had expired by February 2008 at the latest—i.e., well before any of the Credit Unions entered conservatorship.  The FCU Act cannot resurrect those expired claims.  See Regier Carr & Monroe, 996 F.2d at 225.

### C.      The Board's State Blue Sky Law Claims Are Time-Barred.

#### 1.      The Kansas and California Blue Sky Law Claims Are Time-Barred.

The Board asserts claims under the Blue Sky laws of Kansas (on behalf of U.S. Central) and California (on behalf of WesCorp).  Both statutes have a two-year statute of limitations period, running from the date the plaintiff has inquiry notice of its claims.  (See supra § II at Table.)  Because U.S. Central and WesCorp were on inquiry notice of their claims by February 2007 (at the latest), their Blue Sky law claims expired in February 2009 (at the latest). The Board did not place U.S. Central and WesCorp into conservatorship until March 20, 2009. Therefore, the FCU Act does not toll the Board's Kansas or California Blue Sky law claims because they expired before the Credit Unions entered into receivership.  See Regier Carr & Monroe, 996 F.2d at 225.  As a result, those claims are time-barred and should be dismissed.

#### 2.      The Illinois and Texas Blue Sky Law Claims Are Time-Barred.

The Board asserts claims under the Blue Sky laws of Illinois (on behalf of Members United) and Texas (on behalf of Southwest).  Both statutes have a three-year statute of limitations period, running from the date the plaintiff has inquiry notice of its claims.  (See supra

---

[41] As noted in n.35, supra, any alleged misstatements could not have been material after February 2007, in light of the storm warnings that were already part of the total mix of information available to investors.

§ II at Table.)  Because Members United and Southwest were on inquiry notice by February 2007 (at the latest), their Blue Sky law claims expired in February 2010 (at the latest).  The Board did not place Members United and Southwest into conservatorship until September 24, 2010.  Therefore, the FCU Act also does not toll the Board's Illinois or Texas Blue Sky Law claims.  See Regier Carr & Monroe, 996 F.2d at 225.  As a result, those claims are time-barred and should be dismissed.

### 3.   The American Pipe Doctrine Does Not Toll the Board's State Law Claims.

The American Pipe doctrine does not toll any of the Board's state law claims.  "The Tenth Circuit has instructed . . . that where state law supplies the applicable statute of limitations, a court must look to the tolling law of that particular state to determine whether to apply American Pipe tolling."  In re Urethane Antitrust Litig., 663 F. Supp. 2d 1067, 1080 (D. Kan. 2009) (citing State Farm Mut. Auto Ins. Co. v. Boellstorff, 540 F.3d 1223, 1230 n.11 (10th Cir. 2008)).  In the absence of a state decision expressly adopting cross-jurisdictional tolling, federal courts "decline[] to import a tolling doctrine into [ ] state law where it previously did not exist", regardless of whether the state's courts have "declined to adopt the doctrine" or "have not considered the issue of cross-jurisdictional tolling".  In re Urethane, 663 F. Supp. 2d at 1080–82; Clemens v. DaimlerChrysler Corp., 534 F.3d 1017, 1025 (9th Cir. 2008).  California, Illinois, Kansas and Texas have not adopted cross-jurisdictional tolling.[42]  As a result, American Pipe

---

[42] See In re Urethane, 663 F. Supp. 2d at 1082 ("[O]nly a couple of states appear to have adopted cross-jurisdictional tolling.").  The Illinois Supreme Court has held that "the Illinois statute of limitations is not tolled during the pendency of a class action in federal court".  Portwood v. Ford Motor Co., 183 Ill. 2d 459, 467 (1998); see also Ottaviano v. Home Depot, Inc., U.S.A., 701 F. Supp. 2d 1005, 1012 (N.D. Ill. 2010) (applying Portwood in the context of a federal court applying Illinois state law).  Texas courts also reject cross-jurisdictional tolling.  Bell v. Showa Denko K.K., 899 S.W.2d 749, 757 (Tex. App. 1995) ("We do not agree that American Pipe operates to toll our state statute of limitations."); see also Vaught v. Showa Denko K.K., 107 F.3d 1137, 1143–47 (5th Cir. 1997) ("Bell controls" in context of federal court applying Texas statute of limitations).  The Ninth Circuit has observed that the "California Supreme Court has not adopted [ ] cross-jurisdictional tolling."  Clemens, 534 F.3d

tolling does not apply to the Board's state law claims.

Moreover, even if it applied here, the <u>American Pipe</u> doctrine would toll only those claims actually asserted in the previously-filed class actions.  <u>See</u> <u>Sawyer v. Atlas Heating and Sheet Metal Works, Inc.</u>, 642 F.3d 560, 562 (7th Cir. 2011) ("That the period of limitations may be tolled for one claim (state antitrust law) does not imply that it is tolled for another (federal antitrust law)."); <u>Rochford v. Joyce</u>, 755 F. Supp. 1423, 1428–29 (N.D. Ill. 1990) (prohibiting the tolling of those claims which were "different or peripheral" in a subsequent action).  None of the pending class actions asserted California, Texas, Kansas or Illinois Blue Sky law claims.  (<u>See</u> Compl. at Table 7.)  Accordingly, those actions could not toll the Board's state law claims (even if those states had adopted <u>American Pipe</u> tolling, which they have not), making all of the Board's state law claims time-barred.

## III.  THE BOARD'S KANSAS BLUE SKY LAW CLAIMS MUST BE DISMISSED FOR FAILURE TO PLEAD SCIENTER.

The Kansas Blue Sky law requires a showing of scienter in order to state a claim.  <u>See</u> Kan. Stat. Ann. § 17-12a509.  Indeed, this Court recently stated that "[t]he elements for making a claim under the Kansas Uniform Security Act are essentially the same as those for making a section 10(b) claim." <u>Simmons</u>, 2011 WL 673759, at *6 (applying same standard of review to Securities Exchange Act section 10(b) claim and state securities fraud claims).  Under Section 10(b), plaintiffs must show, among other things, that "the defendant acted with scienter, that is, with intent to defraud or recklessness". <u>Id.</u> at *4.  Here, the Board "expressly disclaims and disavows any allegation in th[e] Complaint that could be construed as alleging fraud", (Compl. ¶ 4; <u>see also</u> <u>id.</u> ¶¶ 334, 344, 354, 364, 374, 384, 394, 404, 417, 443), and does not

---

at 1025.  We are aware of no Kansas decision addressing the issue but, again, federal courts will not apply cross-jurisdictional tolling where a state has not affirmatively adopted it.  <u>See</u> <u>In re Urethane</u>, 663 F. Supp. 2d at 1080–82.

purport to allege that the J.P. Morgan Defendants acted with recklessness.  As a result, the Board's Kansas Blue Sky law claims must be dismissed.  See Dronsejko v. Thornton, 632 F.3d 658, 670 (10th Cir. 2011) (affirming dismissal of Section 10(b) claims for failure to plead scienter).

## CONCLUSION

For the foregoing reasons, the J.P. Morgan Defendants respectfully request that the Board's complaint be dismissed in its entirety and with prejudice.

Dated:  October 27, 2011                    Respectfully submitted,


                                            /s/  John W. Shaw
                                            John W. Shaw (KS # 70091)
                                            Thomas P. Schult (KS # 70463)
                                            Jennifer B. Wieland (KS # 22444)
                                            BERKOWITZ OLIVER WILLIAMS
                                            SHAW & EISENBRANDT LLP
                                            2600 Grand Boulevard, Suite 1200
                                            Kansas City, MO 64108
                                            (816) 561-7007 (tel.)
                                            (816) 561-1888 (fax)
                                            jshaw@berkowitzoliver.com
                                            tschult@berkowitzoliver.com
                                            jwieland@berkowitzoliver.com

                                            Of Counsel

                                            Daniel Slifkin (NY # 2439768 )
                                            Michael A. Paskin (NY # 2767507)
                                            CRAVATH, SWAINE & MOORE LLP
                                            825 Eighth Avenue
                                            New York, New York 10019
                                            (212) 474-1000 (tel.)
                                            (212) 474-3200 (fax)
                                            dslifkin@cravath.com
                                            mpaskin@cravath.com

                                            Counsel for Defendants J.P. Morgan
                                            Securities LLC, J.P. Morgan Acceptance
                                            Corporation I and Bond Securitization, LLC

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 27th day of October, 2011, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to all counsel of record.

/s/ John W. Shaw

Counsel for Defendants J.P. Morgan
Securities LLC, J.P. Morgan Acceptance
Corporation I and Bond Securitization, LLC
