# EXHIBIT A



LINKS: 134, 135, 137, 138, 139, 140

1

2

3

4

5

6

7

8

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| In re COUNTRYWIDE FINANCIAL CORP. MORTGAGE-BACKED SECURITIES LITIGATION | Case No. 2:11-ML-02265-MRP (MANx) |
| | |
| FEDERAL HOUSING FINANCE AGENCY, as conservator for THE FEDERAL NATIONAL MORTGAGE ASSOCIATION and THE FEDERAL HOME LOAN MORTGAGE CORP., | Case No. 2:12-CV-1059 MRP (MANx) |
| | **Order Re Motions to Dismiss the First Amended Complaint** |
| Plaintiff, | |
| v. | |
| COUNTRYWIDE FINANCIAL CORPORATION, et al., | |
| Defendants. | |

Case 2:11-cv-02341-EFM-JPO   Document 62-1   Filed 10/24/12   Page 3 of 24
Case 2:12-cv-01059-MRP-MAN   Document 166   Filed 10/18/12   Page 2 of 23   Page ID
#:16744

The Federal National Mortgage Association ("Fannie Mae") and the Federal Home Loan Mortgage Corporation ("Freddie Mac") are government-sponsored enterprises ("GSE,") private corporations chartered by Congress to provide stability in the United States mortgage market, assist in the provision of affordable housing and increase liquidity of mortgage investments. On July 30, 2008, in the midst of the housing crisis, Congress passed the Housing and Economic Recovery Act of 2008 ("HERA,") which created the Plaintiff Federal Housing Finance Agency ("FHFA"). Under that statute, the Director of the FHFA could place the GSEs into conservatorship and appoint the Agency as conservator. 12 U.S.C. § 4617(a)(1). The Director did so on September 6, 2008. As conservator, FHFA has succeeded to all of the legal rights of Fannie Mae and Freddie Mac.

On September 2, 2011, FHFA sued the defendants listed below and other issuers of mortgage-backed securities in New York state court. The matter was removed to federal court on September 30, 2011. The portion of the case involving these defendants was transferred to this Court as related to the Countrywide Multidistrict Litigation proceedings in February 2012. After the Court rejected the plaintiff's motion to remand the case to state court, FHFA filed an amended complaint. On July 13, 2012, the defendants moved to dismiss the amended complaint.

In its First Amended Complaint ("FAC,") FHFA asserts that between August 30, 2005 and January 23, 2008, the GSEs purchased approximately $26.6 billion in residential mortgage-backed securities ("RMBS,") sponsored by Countrywide Financial Corporation, Countrywide Home Loans, Inc., Countrywide Capital Markets, LLC, Countrywide Securities Corporation, CWALT, Inc., CWABS, Inc. and CWMBS, Inc. (the last three are the "Depositor Defendants," and collectively all seven are "Countrywide" or the "Countrywide Defendants"). The FAC also asserts that the securities were underwritten by Banc of America

Securities LLC, Citigroup Global Markets, Inc., Deutsche Bank Securities, RBS Securities, Inc., UBS Securities, LLC (collectively, with Countrywide Securities Corporation, the "Underwriter Defendants").

The RMBS were created through a process called "securitization." Securitization involves the creation of pools of residential mortgage loans, each of which produce cash-flows from the payment on the loans. The rights to the cash-flows of these pools are sold to investors as "certificates." Here, Countrywide Home Loans, Inc. originated or acquired thousands of mortgage loans. It sold the loans to the Depositor Defendants, which then transferred the loans to trusts pursuant to a contract called the Pooling and Servicing Agreement. The trusts issued separate securities in the form of certificates for purchase by investors. The certificate entitled the holder to a portion of the cash-flow from the pool of underlying mortgages. The certificates were sold in "tranches," slices of the loan pool with different priorities of payment, interest rates and credit protection. Upon issuance, the tranches were assigned credit ratings by the credit rating agencies. Investors could select riskier certificates in "lower" tranches with higher interest payments but lower credit ratings than the more "senior" tranches.

The Depositor Defendants filed "shelf" registration statements with the SEC, which entitled them to issue certificates to investors at a later date. Each certificate issued once a "prospectus" that explained the general structure of the investment, and a "prospectus supplement" which included detailed descriptions of the mortgage groups underlying the certificate, were filed with SEC. Investors purchased certificates pursuant to all of the documents filed with the SEC, which were the shelf registration statements, prospectuses, and prospectus supplements (collectively, the "Offering Documents.")

Fannie Mae and Freddie Mac sued the defendants on September 2, 2011, on the grounds that the Offering Documents included false statements regarding the rate of occupancy by the owners of the homes whose mortgage loans backed the

Case 2:11-cv-02341-EFM-JPO   Document 62-1   Filed 10/24/12   Page 5 of 24
Case 2:12-cv-01059-MRP-MAN   Document 166   Filed 10/18/12   Page 4 of 23   Page ID
#:16746

certificates, the ratio of the value of the loans to the underlying value of the homes, and underwriting standards Countrywide adhered to in originating the loans. FHFA brings twelve causes of action based on federal and state securities and common law for the injuries it allegedly suffered from false statements included in the Offering Documents.  The suit is brought against the Countrywide Defendants, the Underwriter Defendants, and individual defendants N. Joshua Adler, Ranjit Kripalani, Stanford Kurland, Jennifer S. Sandefur, Eric Sieracki, and David A. Spector (the "Individual Defendants") for their participation, assistance and control over the filing of misstatements in the Offering Documents.  FHFA also sues Bank of America Corporation, Bank of America, N.A., and NB Holdings Corporation (together, "Bank of America" or the "Bank of America Defendants") as Countrywide's successor.  All of the defendants have filed motions to dismiss the complaint on the basis of jurisdiction and timeliness.

## I.        The Claims Against all Defendants are Timely

Countrywide[1] moves to dismiss counts 1 through 7 as untimely.  The Countrywide Defendants argue that the first three counts in the FAC were not brought within the time limit required by Section 13 of the Securities Act of 1933. Section 13, which is entitled "Limitation of actions," provides that:

> No action shall be maintained to enforce any liability created under [Section 11] or [Section 12(a)(2)] of this title unless brought within one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence . . . In no event shall any such action be brought to enforce a liability created under section [Section 11] or [Section 12(a)(1)] of this title more than three years after the security was bona fide offered to the public,

---

[1]        All of the Defendants join in Countrywide's arguments that the lawsuit is untimely.

4

Case 2:11-cv-02341-EFM-JPO   Document 62-1   Filed 10/24/12   Page 6 of 24
Case 2:12-cv-01059-MRP-MAN   Document 166   Filed 10/18/12   Page 5 of 23   Page ID
#:16747

1    or under section [Section 12(a)(2)] of this title more than three years after

2    the sale.

3    15 U.S.C. § 77m.  The first two counts of the FAC are for violations of

4    Section 11 and Section 12(a)(2), which create civil penalties for false information

5    in a registration statement or prospectus.  The third alleges a violation of Section

6    15, which extends liability to the controllers of violators of Sections 11 and

7    12(a)(2).

8    All of the RMBS purchased by Fannie Mae and Freddie Mac were offered to

9    the public and bought by the plaintiffs before September 2, 2008, more than three

10   years before the filing of this action.[2]  FAC ¶ 2, 44, 53.  Countrywide also suggests

11   that Fannie Mae and Freddie Mac should have discovered any false information in

12   the Offering Documents more than a year before September 6, 2008, meaning that

13   the claims had expired by the time FHFA was appointed conservator.[3]

14   Counts 4 and 5 of the FAC are brought under Virginia state law on behalf of

15   Freddie Mac.  The Virginia Securities Act requires any claims to be brought

16   "within two years after the transaction upon which it is based."  VA. CODE ANN. §

17

18

19   [2]      24 of the certificates were covered by shelf registration statements filed before June 20,

20   2005, and amended before July 25, 2005.  *See FAC* ¶ 51.  "For MBS Offerings pursuant to shelf
     registration statements filed before December 1, 2005, the relevant 'offering' date is the effective

21   date of the registration statement."  *Me. State Ret. Sys. v. Countrywide Fin. Corp.*, 722 F. Supp.

22   2d 1157, 1165 n.8 (C.D. Cal. 2010).  Those 24 certificates all have an offering date before July
     25, 2005, more than three years before FHFA took conservatorship.  Section 11 claims based

23   upon those certificates had already expired by September 6, 2008.  Nothing in HERA revives
     those claims, and the claims were not tolled by the *Luther* class action.  *Allstate Ins. Co. v.*

24   *Countrywide Fin. Corp.*, 824 F. Supp. 2d 1164 (C.D. Cal. 2011) (tolling only applies for
     securities in tranches that the named plaintiff in *Luther* purchased; the *Luther* plaintiff did not

25   purchase in any of the relevant tranches).  Therefore, Section 11 claims based on the 24
     certificates whose shelf registration was filed and amended before July 25, 2005 are untimely

26   and dismissed from this litigation.

27   [3]      Countrywide and Fannie Mae entered into a "tolling agreement" on July 13, 2009, which
     extended certain time periods for Fannie Mae. Since the Court holds that the claims are timely on

28   other grounds, there is no need to interpret the tolling agreement.

Case 2:11-cv-02341-EFM-JPO   Document 62-1   Filed 10/24/12   Page 7 of 24
Case 2:12-cv-01059-MRP-MAN   Document 166   Filed 10/18/12   Page 6 of 23   Page ID
#:16748

13.1-522(D).  Freddie Mac purchased all of its securities before January 23, 2008, more than two years before the filing of the complaint.  FAC ¶ 257.[4]

Counts 6 and 7 are brought under the District of Columbia Securities Act on behalf of Fannie Mae.  Actions under the D.C. Securities Act must be brought within "3 years after the contract of sale or purchase, or . . . within one year after the discovery of the untrue statement or omission or after the discovery should have been made by the exercise of reasonable diligence."  D.C. CODE § 31-5606.05(f).  The D.C. Securities Act is a close analogue to the federal 1933 Act. *Hite v. Lees Weld Equity Partners, IV, LP*, 429 F. Supp. 2d 110, 114 (D.D.C. 2006).

In other words, Countrywide argues that since FHFA did not sue with three years of purchase, Section 13 and the Virginia and D.C. Securities Act bar the first seven counts.  FHFA asserts in response that the claims are timely under a provision of HERA.  As stated, Congress passed HERA in the midst of the housing crisis of 2008.  Besides creating the FHFA, the statute also extends some limitations periods for the agency.  The relevant language from HERA states:

> (12) Statute of limitations for actions brought by conservator or receiver
>
> (A) In general. Notwithstanding any provision of any contract, the applicable statute of limitations with regard to any action brought by the Agency as conservator or receiver shall be—
>
> (i) in the case of any contract claim, the longer of—
>
> (I) the 6-year period beginning on the date on which the claim accrues; or
>
> (II) the period applicable under State law; and
>
> (ii) in the case of any tort claim, the longer of—

---

[4]       FHFA limits Counts 4 and 5 to certificates purchased by Freddie Mac on or after September 6, 2006, in order to comply with Virginia timeliness provisions.  FAC ¶ 451; Mem. in Opp. to Motion to Dismiss ("Opposition Memo,") ECF No. 146, at 15 n.8.

Case 2:11-cv-02341-EFM-JPO   Document 62-1   Filed 10/24/12   Page 8 of 24
Case 2:12-cv-01059-MRP-MAN   Document 166   Filed 10/18/12   Page 7 of 23   Page ID
#:16749

1      (I) the 3-year period beginning on the date on which the claim

2      accrues; or

3      (II) the period applicable under State law.

4      12 U.S.C. § 4617(b)(12)(A).  The crux of this motion to dismiss is the

5  interpretation of this statute ("HERA" or the "extender statute") as to three issues.

6  *First*, does the statute apply to "statutes of repose" as well as to "statutes of

7  limitation?"  *Second*, does HERA extend federal law claims along with state law

8  claims?  *Third*, does the extender statute apply to statutory securities law claims as

9  well as those for tort and breach of contract?

10                    *A.      HERA applies to statutes of repose*

11      Periods of limitation include two linked concepts.  The first is a "statute of

12  limitation."  "A statute of limitation requires a lawsuit to be filed within a specified

13  period of time after a legal right has been violated."  *McDonald v. Sun Oil*, 548

14  F.3d 774, 779 (9th Cir. 2008) (citation omitted).  Statutes of limitation encourage

15  fair and prompt resolution of disputes and prevent the pursuit of stale claims.

16  *Order of R.R. Tels. v. Ry. Express Agency*, 321 U.S. 342, 348–49 (1944).

17  Limitation periods ensure that courts need not adjudicate stale claims when a

18  "plaintiff has slept on his rights."  *See Balam-Chuc v. Mukasey*, 547 F.3d 1044,

19  1049 (9th Cir. 2008) (citation omitted).  Jurisdictions, including the federal

20  government and Washington, D.C. in this case, often delay the commencement of

21  a statute of limitation until the plaintiff is aware of its injury.  *See, e.g.,* 15 U.S.C. §

22  77m (statute of limitation ends "one year after the discovery of the untrue

23  statement or the omission"); D.C. CODE § 31-5606.05(f) (same).

24      The second concept is that of a "statute of repose."  A statute of repose has a

25  "substantive" effect, in that it bars suit regardless of when the plaintiff was injured

26  or first discovered their rights.  *McDonald*, 548 F.3d at 779–80.  The purpose of a

27  statute of repose is to give a defendant peace in the form of an absolute time limit

28  on potential liability.  *Id.*  The statute of repose is focused on the defendant's

Case 2:11-cv-02341-EFM-JPO   Document 62-1   Filed 10/24/12   Page 9 of 24
Case 2:12-cv-01059-MRP-MAN   Document 166   Filed 10/18/12   Page 8 of 23   Page ID
#:16750

interests rather than the plaintiff's, and prohibits litigation based upon some fixed start point, rather than a variable time dependent on when the plaintiff's "legal right has been violated." *Balam-Chuc*, 547 F.3d at 1049. If a plaintiff does not suffer or discover its injury until after the repose period has closed, any claim is untimely, even if brought immediately upon injury. The statute of repose is codified in the "three years after the offer or sale" language in Section 13 and D.C. Securities Act, and the "two years after the transaction" language in the Virginia Securities Act.

The statutes of repose in federal, DC and Virginia law prohibit this suit, brought at least three years after the purchase of the RMBS at issue, unless HERA replaces those periods with a longer time. Countrywide argues that 12 U.S.C. § 4617(b)(12)(A) alters only the "applicable statute of limitations," not statutes of repose. There are three possible interpretations of the term "statute of limitations" in HERA. The first is that the term unambiguously refers *only* to statutes of limitation. *Nat'l Credit Union Admin. Bd. v. Goldman, Sachs & Co.*, No. 11-CV-6521-GW, slip op. (C.D. Cal. Mar. 15, 2012) ("*NCUA Goldman*"); *Nat'l Credit Union Admin. Bd. v. RBS Securities, Inc.*, No. 11-CV-5887-GW, slip op. (C.D. Cal. Jan. 30, 2012) ("*NCUA RBS II*"); *Nat'l Credit Union Admin. Bd. v. RBS Securities, Inc.*, No. 11-CV-5887-GW, slip op. (C.D. Cal. Dec. 19, 2011) ("*NCUA RBS I*"). The second is that the term unambiguously refers to both statutes of limitation and repose. *Fed. Hous. Fin. Agency v. UBS Americas, Inc.*, 858 F. Supp. 2d 306 (S.D.N.Y. 2012). The third is that the term is ambiguous as to these two concepts. *Nat'l Credit Union Admin. Bd. v. RBS Sec., Inc.*, 2012 WL 3028803 (D. Kan. July 25, 2012) ("*NCUA Kansas*"). Text is ambiguous when there is an "uncertainty of meaning or intention." *Black's Law Dictionary* (9th ed. 2009). If the Court concludes that the statute is ambiguous, the parties suggest canons of interpretation that support their particular preferred outcome.

Case 2:11-cv-02341-EFM-JPO   Document 62-1   Filed 10/24/12   Page 10 of 24
Case 2:12-cv-01059-MRP-MAN   Document 166   Filed 10/18/12   Page 9 of 23   Page ID
#:16751

Since recent Congressional enactments and legal decisions include the concept of repose within the term "statute of limitation," the Court rejects Countrywide's proposition that HERA applies only to statutes of limitation.  *See* Sarbanes-Oxley Act, Pub. L. No. 107-204, § 804, 116 Stat. 745 (2002); *In re WorldCom Sec. Litig.*, 496 F.3d 245, 250 (2d Cir. 2007).  Binding Ninth Circuit law requires that the Court interpret any ambiguous periods of limitation in favor of federal agencies like the FHFA.  Therefore, the extender statute applies to periods of repose.

1.   The statutory context surrounding HERA included "repose" within "limitation"

Statutory interpretation begins with the language of the statute itself.  *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 241 (1989).  Mere text is not dispositive, however: "we do not assume that a statutory word is used as a term of art where that meaning does not fit.  Ultimately, context determines meaning." *Johnson v. United States*, 130 S. Ct. 1265, 1270 (2010).  That context is "the ordinary meaning of the [provision] at the time Congress enacted" the statute. *McDonald*, 548 F.3d at 780.

In *McDonald*, the Ninth Circuit considered whether the exception to state statutes of limitation created by the Comprehensive Environmental Repose, Compensation and Liability Act ("CERCLA") also applied to state statutes of repose.  *Id.* at 779.  The statute at issue imposed a discovery rule for environmental suits under CERCLA when the otherwise "applicable limitations period . . . as specified in the State statute of limitations" would conclude at an earlier date.  42 U.S.C.A. § 9658.   Examining case law and law review articles in the years before Congress passed CERCLA in 1986, the court found that the term "statute of limitation" was often confused with or included periods of repose.  *Id.* at 781 nn.3–

Case 2:11-cv-02341-EFM-JPO   Document 62-1   Filed 10/24/12   Page 11 of 24
Case 2:12-cv-01059-MRP-MAN   Document 166   Filed 10/18/12   Page 10 of 23   Page ID
#:16752

4.[5]  As a result, the Ninth Circuit held that the discovery rule applied to state statutes of repose as well as statutes of limitation.  *Id.* at 783–84.  The Court adopts the same approach as the court in *McDonald* and looks to other Congressional statutes and case law to construe the context around the use of the term "statute of limitation" in 2008.

Congressional statutes continue to use the term "statute of limitations" to encompass statutes of repose.  Section 13 is itself entitled "Limitations of Actions," and never uses the word "repose."  15 U.S.C. § 77m.  The provision of the 2002 Sarbanes-Oxley Act that modified statutes of limitation and repose for claims under the Securities Exchange Act of 1934 is entitled "Statute of Limitations for Securities Fraud."  Sarbanes-Oxley, 116 Stat. 745 (codified under a title beginning "Time limitations" at 28 U.S.C. § 1658).  The United States Code is littered with statutory provisions entitled "statute of limitations," "time limits," "time limitations" and "limitations of actions," that regulate both when plaintiffs can bring a claim after discovery of their rights and when plaintiffs are absolutely barred from bringing a claim.  *See, e.g., Jones v. Saxon Mortg., Inc.*, 537 F.3d 320, 326 (4th Cir. 1998) ("[a]ll the parties to this lawsuit concede that [a statute entitled "Time limit for exercise of right"] is a statute of repose and not a statute of limitation."); *Byrd v. Trans Union LLC*, 2010 WL 2555119, at *1 (D.S.C. June 18, 2010) (finding a statute of repose in statutory text that Congress, in the Fair and Accurate Credit Transactions Act of 2003, Pub. L. No. 108-159, § 156, 117 Stat. 1952 (2003), captioned "statute of limitations").[6]

---

[5]     Countrywide argues that the holding in *McDonald* was limited to the fact that "statute of limitation" was ambiguous *in 1986*, and argues that the ambiguity was clarified by 2008.  Reply Mem. in Supp. of Countrywide Defs' Mot. to Dismiss, ("Countrywide Reply,") ECF No. 162, at 18.  The sources below show that Congress and many judges used the terms interchangeably through 2011.

[6]     Countrywide asserts that the phrases "time limit," "time limitations," "limitations of actions" and "limitations period" are legally distinct from "statute of limitations."  Countrywide Reply, at 17.  Even if that is the case, Congress used the specific term "statute of limitations" in Sarbanes-Oxley to modify the cousin statute to Section 13.

Case 2:11-cv-02341-EFM-JPO   Document 62-1   Filed 10/24/12   Page 12 of 24
Case 2:12-cv-01059-MRP-MAN   Document 166   Filed 10/18/12   Page 11 of 23   Page ID
#:16753

Countrywide rejects the reliance on statutory titles as of limited utility and relevant only to the interpretation of the specific statute itself.  These assertions misunderstand the task before the Court.  As *McDonald* found, the term "statute of limitations" was ambiguous in 1986.  In the intervening 22 years, Congress routinely set both periods using the caption "limitation."  *See, e.g.,* 28 U.S.C. § 1658 (modifying the time to bring claims under the 1934 Act without using the words "limitation" or "repose" in the statute itself, instead using the term "time limitations" solely in the caption).  That suggests that in referencing "statute of limitations" in HERA, Congress included any relevant periods of repose.

Judicial opinions also use the phrase "statute of limitation" to apply to repose. *See, e.g., In re WorldCom Sec. Litig.*, 496 F.3d 245, 250 (2d Cir. 2007) (describing Section 13 as "the Securities Act's one- and three-year statutes of limitations"); *Asdar Grp. v. Pillsbury, Madison & Sutro*, 99 F.3d 289, 293–94 (9th Cir. 1996) ("The plain language of the statute of limitations in each section thus shows that the one-year/three-year periods apply to actions for contribution," making clear in a footnote that the "three-year period" refers to the statute of repose); *see also* Opposition Memo, at 22 n.11 (collecting cases).  Indeed, the Seventh Circuit interpreted the Supreme Court as using the term "statute of limitations" as a "generic label for statutes that impose deadlines for filing suit." *McCann v. Hy-Vee, Inc.*, 663 F.3d 926, 932 (7th Cir. 2011) (citing *Merck & Co. v. Reynolds*, 130 S. Ct. 1784 (2010)) (Posner, J.).  Judge Cote explained why, conceptually, the term "statute of limitation" must encompass any repose period – a statute of repose acts upon a statute of limitation by restricting a plaintiff's ability to argue that the limitation period should begin to run at a later point. *UBS Americas*, 858 F. Supp. 2d at 315.  It is clear that it is not merely "isolated cases over the years in which some courts confused the terms or used them interchangeably," but instead that courts throughout the country consistently did so before and after the passage of HERA.

Case 2:11-cv-02341-EFM-JPO   Document 62-1   Filed 10/24/12   Page 13 of 24
Case 2:12-cv-01059-MRP-MAN   Document 166   Filed 10/18/12   Page 12 of 23   Page ID
#:16754

1    Countrywide responds that these cases are not directly on point.  The

2 Defendants instead cite to the wealth of judicial opinions in this Circuit and others

3 distinguishing statutes of repose from statutes of limitation.  This again mistakes

4 the inquiry.  Since Congress "is aware of past judicial interpretations and

5 practices," *In re Egebjerg*, 574 F.3d 1045, 1050 (9th Cir. 2009), the "imprecise

6 language" that courts use to describe statutes of repose provides more context

7 regarding Congress' use of the term.  If federal judges use the terms

8 interchangeably, even after the passage of HERA, Congress would as well.

9    Countrywide offers three additional arguments against this reasoning.  *First*,

10 Defendants point out that the extender statute uses the word "accrue," a word most

11 frequently used in relation to statutes of limitation.  12 U.S.C. § 4617(b)(12)(i)(I)

12 ("the 6-year period beginning on the date on which the claim accrues").  Since

13 statute of limitations are designed to force plaintiffs to act upon their rights, they

14 begin once the plaintiff has a right to vindicate – called the date of accrual.

15 Statutes of repose, on the other hand, are designed only to protect defendants, and

16 are usually measured from an act of the defendant, rather than the plaintiff's right.

17 *See, e.g., Balam-Chuc*, 547 F.3d at 1049.  Use of the word "accrue," however, is

18 not dispositive.  *McDonald*, 548 F.3d at 783 (concluding that use of the word in a

19 Congressional Report was "not evidence that [statutes of limitation] are the only

20 rules it intended" to apply to).  Further, "legislation is not noted for consistent

21 terminology." *McCann*, 663 F.3d at 932.  Though accrual may be a piece of

22 evidence that HERA applies only to limitation, the single reference does not

23 outweigh the wealth of other contextual evidence.

24    *Second*, Countrywide cites to judicial opinions that hold that extender

25 statutes like HERA apply only to statutes of limitation.  *NCUA Goldman*; *NCUA

26 RBS II*; *NCUA RBS I*.  Those rulings, which are tentative in interpreting an

27

28

Case 2:11-cv-02341-EFM-JPO   Document 62-1   Filed 10/24/12   Page 14 of 24
Case 2:12-cv-01059-MRP-MAN   Document 166   Filed 10/18/12   Page 13 of 23   Page ID
#:16755

identical extender statute[7] governing the federal agency empowered to place

federal credit unions into conservatorship, are not determinative. While it is true

that "there was an important distinction between statutes of limitation and statutes

of repose in the nation's securities legislation by 1989," *NCUA RBS I*, at 16 n.19, a

wealth of sources including Congress itself continued to use the *terms*

interchangeably, even if the *concepts* were distinct through 2007. The court in the

*NCUA* cases relies heavily on the fact that *McDonald* is not controlling precedent.

*Id.* In this Court's view, *McDonald* is controlling as the Ninth Circuit's approach

in interpreting statutes that refer to periods of limitation. The other decision

Countrywide cites to, which interprets another identical extender statute,[8] has been

criticized as "unpersuasive" for ignoring "congressional intent," the same inquiry

the Court must resolve here. *Stonehedge/FASA-Texas JDC v. Miller*, 1997 WL

119899, at *2 (5th Cir. Mar. 10, 1997) (discussing *Resolution Trust Corp. v. Olson*,

768 F. Supp. 283 (D. Ariz. 1991)). *Olson*, which refused to apply the extender

statute to statutes of repose, completely ignores the relevant inquiry of *McDonald* –

the context for Congressional use of the term "statute of limitations," rather than

the mere fact that the concepts of repose and limitation are distinct. In fact,

contextual evidence convinced the only court to address this exact question that the

"ordinary usage" of the term "statute of limitation" includes repose. *UBS*

*Americas*, 858 F. Supp. 2d at 314–16. Unlike the tentative rulings, another court to

interpret the credit union extender statute held that "[i]t is not clear that Congress

meant to exclude the three-year deadline from the operation of the extender

statute." *NCUA Kansas*, 2012 WL 3028803, at *16.

   *Finally*, Countrywide argues that since some Congressional statutes and

drafts specifically mention repose, Congress could have done so in HERA "clearly

and easily." Mem. in Supp. of Mot. to Dismiss, ECF No. 139, at 23. Countrywide

---

[7]    12 U.S.C. § 1787(b)(14) (using the exact language as the HERA extender statute).
[8]    12 U.S.C. § 1821(d)(14).

Case 2:11-cv-02341-EFM-JPO   Document 62-1   Filed 10/24/12   Page 15 of 24
Case 2:12-cv-01059-MRP-MAN   Document 166   Filed 10/18/12   Page 14 of 23   Page ID
#:16756

cites to a single statute, uncodified in the United States Code, which mentions the term "repose" with respect to timeliness.  South Carolina Land Dispute, Pub. L. No. 102-339 § 3, 106 Stat. 869 (1992).  Countrywide is wrong.  The Supreme Court rejects interpretations that rely on "the mere possibility of clearer phrasing." *Caraco Pharm. Labs., Ltd. v. Novo Nordisk A/S*, 132 S. Ct. 1670, 1682 (2012).  A single uncodified law using the term shows at best the mere possibility of clearer phrasing.  In fact, an electronic search of the text of the United States Code as of January 2009, similar to the search the Ninth Circuit performed in *McDonald*, revealed a single, irrelevant use of the word "repose."  Office of the Law Revision Counsel, *Search Prior Versions of the U.S. Code*, UNITED STATES HOUSE OF REPRESENTATIVES, *available at* http://uscode.house.gov/search/prevcode.shtml (accessed October 7, 2012) (citing to 30 U.S.C. § 1265(b)(3), which uses the phrase "angle of repose," an engineering term).  The Ninth Circuit mentioned that Congress' knowing choice not to label *any* statutes of repose as such is "additional evidence that the term 'statute of limitations' was ambiguous." *McDonald*, 548 F.3d at 783–84.

The statutory language and case law from the years between 1986 and 2008 provide evidence of the context when Congress passed HERA.  Throughout that time period, Congress itself and respected federal judges across the country used the word "limitation" to refer to both statutes of limitation and repose.  Two district courts have held that the term "statute of limitation" in an extender statute applies to both.  Therefore, the Court holds that HERA does not exclude periods of repose.

> 2.     If the statute is ambiguous, it must be interpreted in favor of FHFA

If the statute is ambiguous, the parties offer various rules to interpret the law in their favor.  The Ninth Circuit has made this task much simpler: "To the extent that a statute is ambiguous in assigning a limitations period for a claim, we will interpret it in a light most favorable to the government." *FDIC v. Former Officers and Dirs. of Metro. Bank*, 884 F.2d 1304, 1309 (9th Cir. 1989).  HERA created

Case 2:11-cv-02341-EFM-JPO   Document 62-1   Filed 10/24/12   Page 16 of 24
Case 2:12-cv-01059-MRP-MAN   Document 166   Filed 10/18/12   Page 15 of 23   Page ID
#:16757

1  FHFA as an agency of the United States, given that it is not "subject to the

2  direction or supervision of any other agency of the United States," 12 U.S.C. §

3  4617(a)(7).  Under binding Ninth Circuit law, any ambiguous limitations period is

4  interpreted in favor of the FHFA.

5      Countrywide distinguishes *Former Officers* as applying only to the FDIC

6  when acting in its "corporate capacity," rather than as conservator or receiver of a

7  private entity.  Nothing in the Ninth Circuit's opinion is so limited to agencies

8  acting in their corporate capacity.  Even were this distinction between

9  conservatorship and corporate capacity relevant, the previously cited language

10  from HERA reads in full "[w]hen acting as conservator or receiver, the Agency

11  shall not be subject to the direction or supervision of any other agency of the

12  United States or any State in the exercise of the rights, powers, and privileges of

13  the Agency."  12 U.S.C. § 4617(a)(7).  FHFA is a federal agency even when acting

14  as conservator or receiver, which means that in the Ninth Circuit, ambiguous

15  statutes of limitation are to be interpreted in its favor.[9]  The district court in Kansas

16  interpreted an ambiguous limitations period in favor of a government agency like

17  FHFA using the same reasoning.  *NCUA Kansas*, 2012 WL 3028803, at *16 ("In

18  the face of this ambiguity, the extender statute should be construed in favor of the

19  government").

20      Countrywide offers another argument if HERA is ambiguous.  According to

21  the Defendants, extending statutes of repose would affect "repeal by implication"

22  of Section 13.  Implied repeal is strongly disfavored.  *Nat'l Ass'n of Home Builders*

23  *v. Defenders of Wildlife*, 551 U.S. 644, 662–63 (2007).  The limited nature of

24  Congress' action, however, makes clear that HERA was not a repeal of any statute.

25

26  [9]      The Ninth Circuit's decision binds this Court regardless of whether the FHFA is a
27  government agency for purpose of *Bivens* claims, *see Herron v. Fed. Nat'l Mortg. Ass'n,* 857 F.
  Supp. 2d 87 (D.D.C. 2012), or a government agency acting for a public purpose, freed from state
28  limitations periods under the *Summerlin* doctrine, *United States v. Summerlin*, 310 U.S. 414
  (1940).

Case 2:11-cv-02341-EFM-JPO   Document 62-1   Filed 10/24/12   Page 17 of 24
Case 2:12-cv-01059-MRP-MAN   Document 166   Filed 10/18/12   Page 16 of 23   Page ID
#:16758

1   HERA simply created a new set of rules for FHFA alone.  *UBS Americas*, 858 F.

2   Supp. 2d at 317 n.8.  Hence, at least in the Ninth Circuit, the ambiguous use of the

3   word "limitation" in HERA must include statutes of repose.

4      3.   The extension of statutes of repose is consistent with the purpose of HERA

5         HERA was passed in an emergency session of Congress, as the housing

6   markets entered crisis.  The apparent purpose of the extender statute was to grant

7   FHFA "more time to decide whether and how to pursue any claims it inherited as

8   Fannie Mae's newly-appointed conservator," in order to "put the regulated

9   entit[ies] in a sound and solvent condition."  *UBS Americas*, 858 F. Supp. 2d at 316

10  (citations omitted).  That purpose can only be met by interpreting HERA to extend

11  periods of repose, to give FHFA sufficient time to pursue the rights it inherited as

12  conservator.[10]

13         **B.   HERA applies to both federal and state law claims**

14         Countrywide next tries to limit the extender statute to state, but not federal,

15  claims, since the extender statute mentions "the period applicable under State

16  Law."  This ignores the fact that HERA applies to "any action brought by the

17  Agency as conservator or receiver."  12 U.S.C. § 4617(b)(12)(A).  The use of the

18  term "any" gives the statute an expansive meaning.  *United States v. Gonzales*, 520

19  U.S. 1, 5 (1997).  There is no uncertainty in the phrase "any action brought by the

20  Agency" and there is no indication from the referenced language that the statute is

21  limited by its specific enumeration of state law.  *Harrison v. PPG Indus., Inc.*, 446

22  U.S. 578, 588–89 (1980).

23

24

25  _____

26  [10]      This result is consistent with another canon of statutory interpretation.  HERA was an
    emergency law, passed in the midst of one of the most serious periods of financial instability in
    American history.  "Legislation enacted to alleviate grave conditions which result from
27  economic disaster and public calamity deserves a generous interpretation so its remedial
    purposes may be accomplished."  Norman J. Singer & J.D. Shambie Singer, *Emergency*
28  *Legislation,* 3A *Sutherland Statutory Construction* § 73:6 (7th ed. 2011).

Case 2:11-cv-02341-EFM-JPO   Document 62-1   Filed 10/24/12   Page 18 of 24
Case 2:12-cv-01059-MRP-MAN   Document 166   Filed 10/18/12   Page 17 of 23   Page ID
#:16759

1    Countrywide points to alleged absurdities created by this interpretation, but

2    cannot address the broad language used in defining the applicable class of claims.

3    Countrywide's arguments also do not resolve the unlikely assertion that a "*federal*

4    statute applying to a *federal* agency . . . *only* applies to *state* law claims."  *NCUA*

5    *Goldman*, at 5 (emphasis in original).  Therefore, the Court follows the other

6    district courts to have ruled on this question in holding that extender statutes like

7    HERA apply to claims brought under both federal and state law.  *See NCUA*

8    *Kansas*, 2012 WL 3028803, at *13–14; *UBS Americas*, 858 F. Supp. 2d at 317;

9    *NCUA Goldman*.

10              *C.      HERA applies to statutory claims*

11    Countrywide cites HERA's reference to "contract" and "tort" claims to

12    assert that those are the only type of action extended.  Statutory claims, which are

13    neither, are not covered.  This argument once again ignores the broad language that

14    Congress used.  The new period of limitation applies to "any action" brought by

15    FHFA.   Courts often apply statutes of limitation to claims not easily characterized

16    as "tort" or "contract" claims.  *See, e.g., FDIC v. Zibolis*, 856 F. Supp. 57, 61

17    (D.N.H. 1994) ("The fact that a [statutory] fraudulent transfer claim cannot easily

18    be defined as a contract or a tort claim does not make the federal statute of

19    limitations inapplicable.  By its plain language, the statute of limitations . . . applies

20    'to any action brought by the FDIC as receiver.' Thus, for statute of limitations

21    purposes, a fraudulent transfer claim is necessarily considered to sound either in

22    contract or in tort."); *FDIC v. Wabick*, 335 F.3d 620 (7th Cir. 2003) (characterizing

23    unjust enrichment claim as contractual for purposes of the statute of limitations

24    applying to the FDIC).  Both the *UBS Americas* and *NCUA Kansas* courts

25    concluded that statutory claims are extended by HERA and the credit union

26    extender statute.

27              *D.      For purposes of this motion, FHFA's claims are timely*

28

17

Case 2:11-cv-02341-EFM-JPO   Document 62-1   Filed 10/24/12   Page 19 of 24
Case 2:12-cv-01059-MRP-MAN   Document 166   Filed 10/18/12   Page 18 of 23   Page ID
#:16760

1    HERA extends by at least three years the statutes of repose and limitation for

2    claims that were live as of September 6, 2008, the date FHFA was appointed

3    conservator of Fannie Mae and Freddie Mac.  A claim was live then if it was

4    "within one year after the discovery of the untrue statement or the omission, or

5    after such discovery should have been made by the exercise of reasonable

6    diligence" and within "three years after the security was bona fide offered to the

7    public" or "more than three years after the sale."  15 U.S.C. § 77m.  The FHFA

8    was appointed conservator within three years of the bona fide offer or sale for the

9    62 certificates not covered by footnote 2, *supra*.  The extension of the statutes of

10   repose gave FHFA until at least September 6, 2011 to bring this suit.

11   The claims could still be untimely under Section 13 and the D.C. Securities

12   statute of limitation if Fannie Mae and Freddie Mac discovered or should have

13   discovered that the Offering Documents contained material misstatements more

14   than one year before September 6, 2008.  In its motion, Countrywide does not

15   dispute that the claims were brought within one year of the discovery of any

16   alleged untrue statements.  Both parties cite to an earlier decision of this Court, that

17   a reasonable investor "was clearly on notice of Countrywide's misrepresentations

18   regarding underwriting standards by late 2007 or early 2008."  *Stichting*

19   *Pensioenfonds ABP v. Countrywide Fin. Corp.*, 802 F.Supp.2d 1125, 1137 (C.D.

20   Cal. 2011).  The discovery date mentioned in *Stichting* would mean these claims

21   were alive on September 6, 2008, and therefore extended for at least three years.

22   For purposes of a motion to dismiss, the Court accepts that FHFA did not and

23   could not know of its rights until after September 6, 2007.  These claims were alive

24   on September 6, 2008, giving FHFA at least three more years to sue the

25   Defendants.  The complaint complies with the statutes of repose and limitation of

26   federal, D.C., and Virginia law, and is therefore timely in full.[11]

27

28   _____

[11]        However, at some later stage of the litigation, the Court must consider whether Fannie
Mae and Freddie Mac discovered misstatements at an earlier date.  Countrywide may be able to

18

Case 2:11-cv-02341-EFM-JPO   Document 62-1   Filed 10/24/12   Page 20 of 24
Case 2:12-cv-01059-MRP-MAN   Document 166   Filed 10/18/12   Page 19 of 23   Page ID
#:16761

1  *II.   The Law of Virginia and Washington, D.C. can Constitutionally Apply to the*

2  *Individual Defendants*

3      The Individual Defendants argue that neither Virginia nor D.C. state

4  law can apply to them under the Due Process Clause and Full Faith and

5  Credit Clause of the Constitution.  The "legislative jurisdiction" doctrine,

6  which derives from those two constitutional provisions, forbids the

7  application of a state law where the state has "no significant contact or

8  significant aggregation of contacts, creating state interests, with the parties

9  and the occurrence or transaction."  *Allstate Ins. Co. v. Hague*, 449 U.S. 302,

10  308 (1981).

11      The Ninth Circuit has defined three distinct categories with separate

12  doctrinal tests to determine when a state can constitutionally apply its law.

13  *Gerling Global Reinsurance Corp. of Am. v. Low*, 296 F.3d 832, 839 (9th

14  Cir. 2002), *rev'd sub. nom. Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396

15  (2003).  This matter falls into one of the first two categories defined in

16  *Gerling*, which are "regulation of out-of-state entities on the basis of

17  incidental in-state contacts" and "regulation of the substance of out-of-state

18  transactions."  *Id.* at 839–40.[12]

19      The cases the Ninth Circuit cites explaining its first category involve

20  "direct regulation," like taxing, reporting and licensing requirements for out-

21

22  show that the GSEs, powerful market making institutions, knew that the securities they were
23  purchasing failed to conform to the guidelines listed in the Offering Documents.  That
    knowledge is relevant for two purposes: first, if Fannie Mae or Freddie Mac were aware of
24  misstatements before September 6, 2007, the claims accrued more than a year before FHFA was
    appointed conservator, and may therefore be untimely. Second, a plaintiff cannot make a valid
25  claim under Section 11 when "he knew of such untruth or omission" at the time of his
    acquisition of the security.  15 U.S.C. § 77k(a).  In the first regard, the Court finds itself in
26  disagreement with the fixed accrual date found by Judge Cote, who determined that the claims
    only accrued when the certificates were downgraded by the credit rating agencies in February
27  and March 2008.  *UBS Americas*, 858 F. Supp. 2d at 321.
28  [12]     The third category is "taxation of in-state entities arising from transactions conducted
    entirely out-of-state."

Case 2:11-cv-02341-EFM-JPO   Document 62-1   Filed 10/24/12   Page 21 of 24
Case 2:12-cv-01059-MRP-MAN   Document 166   Filed 10/18/12   Page 20 of 23   Page ID
#:16762

1  of-state parties acting within the state. *See Quill Corp. v. North Dakota*, 504

2  U.S. 298, 302 (1992) (collecting a use tax from corporations engaging in

3  regular solicitation in the state); *Am. Charities for Reasonable Fundraising*

4  *Regulation v. Pinellas Cty.*, 221 F.3d 1211, 1213 (11th Cir. 2000) (requiring

5  registration of out-of-state charitable entities); *Adventure Commc'ns, Inc. v.*

6  *Kentucky Registry of Election Fin.*, 191 F.3d 429, 437 (4th Cir. 1999)

7  (analyzing whether there were sufficient "state interests such that it would

8  not be fundamentally unfair to subject the [Defendants] to the Kentucky

9  campaign reporting requirements."). The second category includes

10  situations where the application of a state's law will "alter" the "substance of

11  the transaction." *Gerling*, 296 F.3d at 840–41. The Ninth Circuit looks to

12  scenarios where state law attempts to regulate an out-of-state contract.

13  The Court is unsure of the distinction between "directly regulating

14  out-of-state entities" and "direct regulation of out-of-state transactions,"

15  since both serve to incentivize or penalize behavior of an out-of-state actor.

16  Plainly, though, the doctrinal tests that apply to each category are very

17  different. Direct regulations of out-of-state entities are constitutional when

18  there are minimum contacts between the state, the defendants, and the

19  regulated activities, which is parallel to the Supreme Court's "minimum

20  contacts" test for personal jurisdiction. *Gerling*, 296 F.3d at 839. Direct

21  regulations of transactions are constitutional whenever there are "sufficient

22  contacts with the parties and the transaction." *Id.* at 841 (citing *Hague*, 449

23  U.S. at 308).[13] The Individual Defendants admit that "sufficient contacts"

24

25  _____

26  [13]        The Court is not even confident that the doctrinal tests themselves are different. While
the Ninth Circuit only cites to Hague and what it calls the "choice-of-law" cases in describing the
27  "sufficient contacts" test, two of the cases cited to in formulating the "minimum contacts" test
also cite to Hague and the choice-of-law cases. See *Adventure Commc'ns*, 191 F.3d at 435–36;
28  *Am. Charities*, 221 F.3d at 1216. In fact, the Court of Appeals seems to have misinterpreted
*Adventure Communications*. The Fourth Circuit specifically rejects a "minimum contacts"

Case 2:11-cv-02341-EFM-JPO   Document 62-1   Filed 10/24/12   Page 22 of 24
Case 2:12-cv-01059-MRP-MAN   Document 166   Filed 10/18/12   Page 21 of 23   Page ID
#:16763

1    are fewer than "minimum contacts."  Reply Mem. in Supp. of Adler,

2    Kripalani and Sandefur's Mot. to Dismiss, ("Individual Defendants Reply

3    Memo,") ECF No. 159, at 9–10.

4          Turning to the matter at hand, it is not obvious in which category the

5    D.C. and Virginia Securities laws belong.  *Gerling* suggests that laws fall

6    into the first category if they place "direct demands" on out-of-state-entities,

7    with penalties imposed for noncompliance.  *Gerling*, 296 F.3d at 840.  Laws

8    are properly within the second category if they "regulate the substance of

9    out-of-state transactions."  *Id.* at 842.  The state "Blue Sky" laws[14] at issue

10   here do not place direct demands for information or registration on out-of-

11   state entities, unlike the state laws in *Quill*, *American Charities*, and

12   *Adventure Communications.*  However, the Blue Sky laws do place

13   sanctions on entities that fail to comply with them.  The laws can regulate

14   the substance of out-of-state transactions.  D.C. CODE § 31-5606.05(a)(1)(B)

15   (imposing liability for an "untrue statement of a material fact"); VA CODE

16   ANN. § 13.1-516 (describing liability for statements that are "false or

17   misleading in any material respect").  Conceivably, the sale of securities

18   using such false statements could be lawful in another jurisdiction, but any

19   sale on that basis would still violate D.C. and Virginia law.  That would be a

20   substantive regulation, altering the nature of the out-of-state sale.

21         The Court concludes that the application of D.C. and Virginia law fall

22   into the second category, subject to the "sufficient contacts" test.  The Blue

23   Sky laws at issue here do not directly regulate any business within any

24   specific industry; instead applying generally to any person selling a

25

---

26   analysis in favor of a blended test that looks to whether there are "sufficient contacts."
27   *Adventure Commc'ns*, 191 F.3d at 437.
     [14]    "Blue Sky" laws are state laws "establishing standards for offering and selling
28   securities."  *Black's Law Dictionary* (9th ed. 2009).  48 American jurisdictions passed such laws
     between 1911 and 1933.  *Id.*

Case 2:11-cv-02341-EFM-JPO   Document 62-1   Filed 10/24/12   Page 23 of 24
Case 2:12-cv-01059-MRP-MAN   Document 166   Filed 10/18/12   Page 22 of 23   Page ID
#:16764

"security."  The relevant state laws attach civil penalties for the sale of securities "by means of an untrue statement of a material fact," which regulates how the sale occurred. That is the gravamen of Gerling's second category.

Under the doctrinal test for the second category, the Court must assess whether the allegations in the FAC show that Virginia and D.C. "have a significant contact or significant aggregation of contacts, creating state interests, such that choice of its law is neither arbitrary nor fundamentally unfair."  *Hague*, 449 U.S. at 313.  Two relevant contacts are plaintiff's status as a commuter into the state seeking to apply its law and general business contacts between the defendant and the state.  *Id.* at 314, 317.  The FAC accuses the Underwriter and Depositor Defendants of targeting Fannie Mae in Washington, D.C. and Freddie Mac in Virginia, by sending offering materials with allegedly false statements.  FAC ¶ 55.  The FAC also states that the Individual Defendants conducted and participated in the mailings. *Id.* ¶¶ 14, 470, 504.  Plaintiffs were actual residents of Washington, D.C. and Virginia, not mere commuters.  The Individual Defendants marketed national securities into the jurisdictions.  These contacts are sufficient under *Hague* to apply D.C. and Virginia securities laws to these defendants.[15]

Individual Defendant David Spector also argues that if the Securities Act claims were dismissed, then the transferor court (the Southern District of New York) would not have personal jurisdiction over him.  Since those

---

[15]      The Individual Defendants Adler, Kripalani and Sandefur attempt to cabin *Hague's* holding to "the selection of one state's law between the laws of two states."  Individual Defendants Reply Memo, at 10.  This is an incorrect interpretation of *Hague*, which merely held that the selection of one state's law did not violate the Constitution, not that another choice was unconstitutional.  The FHFA makes clear that if this case against the Individual Defendants were dismissed, it would re-file its claims under California law, where all of the Individual Defendants reside.  In other words, the Court must choose whether only California law can apply to the Individual Defendants, or whether California law as well as that of another state can do so.  That is the same question the Supreme Court faced in *Hague*.

Case 2:11-cv-02341-EFM-JPO   Document 62-1   Filed 10/24/12   Page 24 of 24
Case 2:12-cv-01059-MRP-MAN   Document 166   Filed 10/18/12   Page 23 of 23   Page ID
#:16765

1    claims were not dismissed, the transferor court, and this Court, retain

2    jurisdiction.

3                         *III.*     *Conclusion*

4       With the exception of claims based on the 24 Certificates issued

5    pursuant to shelf statements filed before July 25, 2005, the Court has

6    rejected each argument brought by defendants at this stage of the litigation.

7    HERA extends statutes of repose and limitation.  HERA lengthens the time

8    periods for statutory, federal and state law claims.  The claims brought by

9    FHFA were timely as of September 6, 2008.  There are sufficient contacts

10    between the transactions at issue and the jurisdictions of Washington, D.C.

11    and Virginia to properly subject the Individual Defendants to their law.  **The**

12    **Defendants' motions to dismiss are denied.**

13       **IT IS SO ORDERED.**

14

15    DATED:  October  18, 2012

16                            Hon. Mariana R. Pfaelzer

17                            United States District Judge

18

19

20

21

22

23

24

25

26

27

28